RAITT ET VIR *v.* THE JOHNS HOPKINS
HOSPITAL ET AL.

[No. 169, September Term, 1974.]

*Decided April 14, 1975.*

490

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Marvin Ellin,* with whom were *Jonathan Schochor* and *Henry E. Dugan, Jr.,* on the brief, for appellants.

*Hugh E. Donovan,* with whom was *William A. Ehrmantraut* on the brief, for The Johns Hopkins Hospital, part of appellees. *John F. King* for Andrew C. W. Montague, other appellee.

LEVINE, J., delivered the opinion of the Court.

The unfortunate chain of events culminating in this appeal commenced on May 15, 1972, when appellant, Anna M. Raitt (the patient), underwent a laparoscopy tubal ligation, a birth control procedure performed by appellee Montague (the physician) at the Johns Hopkins Hospital (the hospital). As a result of complications which developed from that operation, she filed suit against appellees in the Baltimore City Court claiming damages for their alleged negligence. The case was removed to the Circuit Court for Montgomery County where the trial commenced on January 28, 1974, before a jury presided over by Judge Joseph M. Mathias, ultimately resulting in a directed verdict for both appellees. On appeal to the Court of Special Appeals,

judgment was affirmed in *Raitt v. Johns Hopkins Hospital*, 22 Md. App. 196, 322 A. 2d 548 (1974). We then granted a Writ of Certiorari.

Because of the limited scope of the issues presented on this appeal, it is unnecessary for us to include an extensive review of the facts upon which the alleged negligence is based. The declaration alleges that appellant was an outpatient at Johns Hopkins while the procedure was performed. Dr. Montague informed her that since the operation would require less than one hour, she would be free to return to her home on that same day. Experiencing severe stomach pain, however, she complained upon regaining consciousness to various hospital personnel, including physicians and nurses in whose care she had been placed by Dr. Montague during his absence from the hospital. They assured her that these symptoms were usual and customary for this type of procedure and, against her wishes, released her that day.

On the following day, the patient's daughter telephoned the physician and informed him of the persistent abdominal pain and a developing condition of nausea. He advised her that the pain was normal for this procedure, and attributed the nausea to a virus. He called a pharmacy and prescribed a pain-relieving drug for the abdominal discomfort and a medication for the virus. Later that day, after being informed that the patient's condition had become intolerable, the physician yielded to her request that she be allowed to report to the emergency room at the hospital. Upon arriving there, the patient was subjected to various tests and examinations which revealed that as a result of alleged negligence in the performance of the laparoscopy and tubal ligation, she had sustained a perforation in the bowel. This, in turn, had caused peritonitis and a resulting infectious process, which had spread throughout her body.

In consequence of the perforation and the alleged failure to repair it promptly, the patient underwent surgery — two days after the initial procedure — resulting in the excision of a portion of the intestine. Also, because of the injury and the consequent deterioration of her health, blood clots

developed which entered her lungs. It was necessary for her to remain confined to the hospital until June 24, 1972. Later, she was also admitted to Temple University Hospital in Philadelphia for study and treatment.

The trial of the case in the circuit court commenced with elaborate opening statements by counsel for the respective parties. Appellant then produced as her first witness, a Doctor Marshall Klavan of Philadelphia, who, following graduation from the Medical College of Virginia, had served a one-year internship and a four-year residency in obstetrics and gynecology at Sinai Hospital in Baltimore. He then began to practice privately in his specialized field in the Philadelphia area. He holds a full professorship in that specialty at Hahnemann Medical College in Philadelphia, and is chairman of the same department at the Crozer Medical Center, a teaching hospital in Chester, Pennsylvania. He is "board-certified" in his field, *i.e.*, he is certified by the American Board of Obstetrics and Gynecology. In addition, he holds memberships in a number of medical societies and professional groups. He is not licensed to practice medicine in Maryland, and has never maintained an office in this state.

After the witness's background had been presented and he had been subjected to *voir dire* examination, the court ruled that he was qualified to testify as an expert in the field of gynecology. A proffer was then made to show that the witness was qualified to testify concerning the standard of medical care to be applied in this case. As part of this proffer, it was asserted that the certifying examinations of the American Board of Obstetrics and Gynecology are uniform throughout the country; that Dr. Klavan had treated patients from Maryland, and had therefore been required to review their Maryland hospital charts; that he was also acquainted with Maryland standards through his attendance at professional meetings with colleagues from this area — including Baltimore — at which views had been exchanged on the subjects involved here; and that through other professional contacts, he had concluded that the standard of care in Baltimore and Philadelphia for the

surgical procedure followed here is the same, indeed, that there is a single national standard.

When the court indicated that it would preclude Dr. Klavan from presenting any testimony concerning the applicable standard of care in the Baltimore community, appellant, with the consent of appellees, enlarged her proffer to include also the proposed testimony of three other medical witnesses from Philadelphia, who were prepared to testify that for reasons similar to those furnished by Dr. Klavan, they were familiar with the standard of care applicable to the Baltimore community on the date of the operation performed here; and that this standard, which was the same throughout the country, had been breached in this case.

After hearing extensive argument from counsel, the trial court ruled that none of the four medical witnesses tendered by appellant was qualified "to express opinions as to the standards of care in the City of Baltimore in the performance of the surgical procedure which is in question in this case." It arrived at this conclusion because none of the witnesses had ever practiced in Maryland; had ever enjoyed any hospital privileges in Maryland; or had ever maintained an office in this state. The court rejected Dr. Klavan's five-year experience as an intern and resident at Sinai Hospital because the particular procedure involved here, a laparoscopy, had not yet been developed at that time. This colloquy then ensued:

"(Mr. Ellin) Your Honor, I take it, then, this prevents the Plaintiff from going forward because these are the witnesses, the only remaining physician is a treating family doctor in Baltimore, Dr. Kolodny, who I did not intend to question as to the performance of laparoscopic procedures because he is not an obstetrician or gynecologist.

"So, since the Plaintiffs cannot go forward it would seem, then, Your Honor, that the Defendants anticipated motion for directed verdict forthcoming would have to be granted and I would urge that we have no other evidence on which this case could get

494

to the jury to save the Court time and everybody else time.

"(The Court) Does the Plaintiff rest its case?

"(Mr. Ellin) The Plaintiff would rest, in view of Your Honor's ruling.

\* \* \*

"(Mr. Ellin) I am responding to the Court's ruling of barring my witnesses from testifying, so that the Plaintiff must rest. It is unable to go forward with this particular witness.

"(The Court) I am not barring your witnesses from testifying. I am simply saying that in my opinion none of your proposed witnesses can qualify as experts to offer an opinion upon the standards of care of a doctor in Baltimore City performing this particular surgical procedure.

"(Mr. Ellin) That is what the case is about, so the Plaintiff rests."

On appeal, the Court of Special Appeals expressed its disagreement with the ruling of the trial court insofar as that decision was "based upon the fact that the witnesses proffered did not practice in the community in which the alleged negligent treatment occurred." *Raitt v. Johns Hopkins Hospital, supra,* 22 Md. App. at 203. Nevertheless, the Court of Special Appeals affirmed the circuit court judgment because appellant, although proffering to show a lack of requisite skill or care, had failed to "establish a direct causal connection between any want of requisite skill and care on the part of [appellees] and the injury to [appellant]." *Id.* at 214. Initially, therefore, we consider the correctness of this holding.

(1)

As we have indicated, in holding that the directed verdict was properly granted, the Court of Special Appeals held that, although establishing by her proffer that appellees had

not exercised the requisite skill or care, appellant rested her case without establishing the other element required for a *prima facie* cause of action for medical malpractice — a causal connection between the want of skill or care and the injury.

This holding is challenged by appellant, who contends that the second component of her case was supplied in these various ways: By statements of her counsel in his opening address to the jury and during the extensive proffer concerning the out-of-state physicians; by hospital records which had been introduced into evidence; and by admissions of counsel for the appellees made in their opening statements. Moreover, the initial injury sustained during the surgical procedure was not only proven, she maintains, but admitted. Hence, appellees are responsible for all of the other consequences, such as the peritonitis, since they resulted from the primary injury. Appellees respond to these arguments by contending that opening statements do not constitute proffers of evidence; that the proffer actually made by appellant did not include a reference to causal connection; and that neither the hospital records nor the opening statements supplied the missing ingredient. In our view, it is unnecessary for us to decide whether appellant presented a *prima facie* case under any of these theories, since we think the Court of Special Appeals erred in reaching this question.

Immediately after the direct examination of Dr. Klavan began, it became apparent that appellant would encounter difficulty in eliciting the applicable standard of care from her medical witnesses. The resistance to this proposed testimony was inspired primarily by the case of *Dunham v. Elder*, 18 Md. App. 360, 306 A. 2d 568 (1973), which the Court of Special Appeals had decided shortly before the trial of this case. That decision was advanced by appellees to the trial judge as authority for their single contention that the so-called "strict locality" rule requires an expert medical witness to practice in the same locale or community as the defendant in a given medical malpractice case, if he is to render an opinion of the standard of care applicable to that

locale or community. The argument on this question eventuated in the previously discussed proffer made by counsel for appellant. It was preceded by this colloquy:

". . . [I]f you will permit me to go forward and permit me to develop this testimony and then if Your Honor will re-examine and revisit this decision you will see the distinguishing aspects of it.

"(The Court) I can't see them yet. You have tried to tell me.

"(Mr. King) Your Honor, I might say—this is what I was going to interrupt Mr. Ellin about — *I have no objection,* in the interest of expense that may be attendant to the Plaintiff to going ahead, to his *truncating his proof* and making a proffer.as to what you are going to show and *rest the case.* I don't think —

"(Mr. Ehrmantraut) That is agreeable with us." (emphasis added).

The proffer was then made, and was followed by the direction of the verdict. That action occurred in this staccato-like exchange:

"(Mr. Ellin) That is what the case is about, so the Plaintiff rests.

"(Mr. King) I move for a directed verdict.

"(Mr. Donovan) I move for a directed verdict, Your Honor.

"(The Court) I grant the motion for directed verdict."

Following this ruling, the court explained its decision to the jury. These comments, together with all those previously made by the court, clearly reveal that the sole ground for the directed verdict was an interpretation of *Dunham* to the effect that the out-of-state physicians were precluded from expressing an opinion on the applicable standard of care because they had neither practiced medicine nor treated any patients in the City of Baltimore. In short, neither the appellees in their arguments nor the court in its

observations or rulings ever referred to the question of causal connection.

In what strikes us as something of an afterthought, therefore, the issue of causal connection was raised by appellees for the first time in their briefs in the Court of Special Appeals. From a careful examination of the record — especially in light of the near stipulation that appellant should follow the very procedure that was applied here — we are firmly persuaded that at the trial, neither counsel nor the court, all of whom appear to have been engrossed in *Dunham*, even considered the issue of causal connection. There is little reason to doubt appellant's ability to establish this element of her case — by testimony or proffer — had she been permitted to reach that point. In the particular circumstances of this case, therefore, the question should not have been regarded as properly preserved for appellate review under Maryland Rule 1085.[1]

Hence, the only question which should have been considered on appeal was the qualification of appellant's medical witnesses to express their opinions on the applicable standard of care. We turn now to that question.

### (2)

We noted earlier that the trial court's refusal to permit any testimony by appellant's expert witnesses on the standard of care applicable to this case rested on the specific ground that none of the witnesses had ever practiced or treated patients in Maryland, and had neither enjoyed hospital privileges nor maintained offices in Maryland. This ruling, as we also observed, was bottomed solely on *Dunham v. Elder, supra*, which we were never asked to review. There, the court summarized the three major rules which have been applied by the courts with regard to the proper standard of

---

1. Indeed, it is questionable whether the court should even have entertained the motions for directed verdict, since neither of the appellees complied with Rule 552 a by stating "the grounds therefor." Had either done so, as we have intimated, the need to consider this issue would likely have been obviated.

medical care which must be observed by a physician.[2] They are:

(1) "The liberal rule" in which the standard of care is not tied to any particular geographic locality.

(2) "The similar locality rule" which states that the standard of care is that observed by physicians of ordinary skill and care in either the defendant-physician's locality or in a similar community.

(3) "The strict locality rule" in which the standard of care is that exercised by physicians in the defendant's own community or locality.

The Court of Special Appeals reached this conclusion in *Dunham v. Elder, supra*: ". . . We read the Maryland precedents to apply the more strict rule that the plaintiff must show that the defendant-physician failed to exercise 'the amount of care, skill and diligence . . . which is exercised generally *in the community . . . in which he was practising* . . . .' " *Id.* at 364 (emphasis in original).

A review of our prior decisions suggests that actually we have never been confronted with the need to make a deliberate selection from among the three rules. The early Maryland cases appear to apply the more liberal rule. For example, in *Dashiell v. Griffith*, 84 Md. 363, 380-81, 35 A. 1094 (1896), our predecessors stated: ". . . The cases are generally agreed upon the proposition, that the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by *others in the profession generally*. . . ." (emphasis added). There had been a hint of this standard in *State, use of Janney v. Housekeeper*, 70 Md. 162, 172, 16 A. 382 (1889), where this Court held that ". . . the degree of care and skill required is that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their patients . . . ."

This rule, which makes no reference whatever to the defendant-physician's community, was consistently followed prior to 1962. *See, e.g., Lane v. Calvert*, 215 Md. 457, 462, 138

---

2. See Dunham v. Elder, supra, 18 Md. App. at 363-64.

A. 2d 902 (1958) (standard of care "such as is ordinarily exercised by others in the profession generally."); *McClees v. Cohen*, 158 Md. 60, 66, 148 A. 124 (1930). Indeed, it has been quoted occasionally even since 1962, *Nolan v. Dillon*, 261 Md. 516, 534, 276 A. 2d 36 (1971) (standard of care "such as is ordinarily exercised by others in the profession generally."); *Anderson v. Johns Hopkins Hosp.*, 260 Md. 348, 350, 272 A. 2d 372 (1971) (". . . the standard of skill and care ordinarily exercised by surgeons in cases of this kind . . . ."); *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 620, 258 A. 2d 595 (1969) (". . . the standard of skill and care ordinarily exercised by surgeons in cases of this kind . . . .").

The so-called "strict locality" rule was mentioned for the first time in *State, use of Solomon v. Fishel*, 228 Md. 189, 179 A. 2d 349 (1962), generally regarded as the purported authority for this proposition in Maryland. It is interesting to note, however, that *Fishel* did not turn on the standard of care issue, but dealt with the proper use of hypothetical questions to be addressed to medical experts, and with a jury instruction involving the plaintiff's burden of proof. Similarly, although tangential references to the "strict locality" rule, citing *Fishel*, appear in *Tempchin v. Sampson*, 262 Md. 156, 277 A. 2d 67, 51 A.L.R.3d 1268 (1971) and *Kruszewski v. Holz*, 265 Md. 434, 290 A. 2d 534 (1972), in neither of those cases were we confronted directly with the issue. Thus, the only Maryland case in which the question has been presented squarely is *Dunham*, where, as we stated earlier, the court, citing *Fishel* as authority, flatly held that Maryland applies the "strict locality" rule.

Nothing in *Dunham* or any of our prior cases, however, supports the ruling of the trial court in this case that a medical witness who does not practice in the same locality as the defendant-physician, may not testify on the standard of care in that community even though he is familiar with it. As the Court of Special Appeals said below:

> ". . . If the evidence is sufficient to show fairly to the reasonable satisfaction of the trial judge that the expert witness proffered is familiar with the local standard concerned, that witness, otherwise

qualified, may testify as an expert with respect to the standard." *Raitt v. Johns Hopkins Hospital, supra,* 22 Md. App. at 203.

A careful reading of *Dunham* clearly demonstrates that the court, although noting that the experts offered there had never practiced, treated patients, enjoyed hospital privileges or maintained an office in Maryland, was not imposing such qualifications, as absolute requirements, upon an expert called to testify on the applicable standard of care. The *Dunham* court, as the Court of Special Appeals said below, was "merely noting the background of the physicians involved." *Id.*

The import of the trial court ruling in this case was that appellant's expert witnesses were unqualified, as a matter of law, to render their opinions on the applicable standard of care. In so holding, the court erred. Even assuming arguendo that the "strict locality" rule is to be followed, the expert witness need only possess such knowledge of the applicable standard of care as will enable him to render an informed opinion. There is no absolute requirement that he practice or reside in the defendant-physician's community. It is important here to distinguish between the requisite qualifications of an expert witness and the subject matter of his testimony itself. *Fishel* and the other cases reciting the "strict locality" rule deal only with the subject matter of the opinion testimony to be elicited from the expert witness. None of these cases purports to enunciate any qualifications for an expert witness testifying on the standard of care.

On the subject of an expert witness's qualifications, we said in *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 298-99, 29 A. 2d 653 (1943):

"... It is a familiar rule of evidence that a witness, in order to qualify as an expert, should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate. It is sufficient if the court is satisfied that the expert has in some

way gained such experience in the matter as would entitle his evidence to credit. . . . A witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to make it appear that his opinion is of some value, whether such knowledge has been gained from observation or experience, standard books, . . . or any other reliable sources. . . ."

*Accord, Consol. Mech. Contractors v. Ball*, 263 Md. 328, 338, 283 A. 2d 154 (1971); *Scott v. Hampshire, Inc.*, 246 Md. 171, 176, 227 A. 2d 751 (1967); *Rotwein v. Bogart*, 227 Md. 434, 437, 177 A. 2d 258 (1962). Whether a witness is qualified to testify as an expert, of course, is largely within the sound discretion of the trial court, *Consol. Mech. Contractors v. Ball, supra*, 263 Md. at 338; *Mondawmin Corporation v. Kres*, 258 Md. 307, 320, 266 A. 2d 8 (1970); *Stickell v. City of Baltimore*, 252 Md. 464, 471-72, 250 A. 2d 541 (1969).

Therefore, the proper approach to have been followed here was for the trial court, in the exercise of its discretion, to consider whether the medical witnesses had practiced, treated patients, enjoyed hospital privileges or maintained an office in Maryland, together with all the other factors which usually enter into the equation of a physician's qualifications as an expert witness. This course should be followed on the retrial of this case.

> *Judgment of the Court of Special Appeals reversed; remanded to that court with instructions to reverse the judgment of, and remand the case to, the Circuit Court for Montgomery County for a new trial; appellees to pay costs.*