710 A.2d 318

**JOHNSON & HIGGINS OF PENNSYLVANIA, INC.**

**v.**

**HALE SHIPPING CORPORATION.**

**No. 998, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

May 1, 1998.

Reconsideration Denied June 23, 1998.

428

John B. Sinclair (Rachel T. McGuckian and Miles & Stockbridge on the brief), Towson, for appellant.

Paul Mark Sandler (Stacie F. Dubnow, T. Allen Mott and Freishtat & Sandler on the brief), Baltimore, for appellee.

Argued before MURPHY C.J., and WENNER, J., and JOHN F. KELLY, Sr., Judge (Specially Assigned).

JOHN F. KELLY, Sr., Judge.

In a seven count complaint, appellee, Hale Shipping Corporation, sued their insurance broker, Johnson & Higgins of Pennsylvania, Inc. ("Johnson & Higgins"), appellant. By stipulation, the original seven-count complaint was reduced to only two counts, which alleged negligence and breach of contract on the part of Johnson & Higgins. The gravamen of the complaint was that Johnson & Higgins had failed to protect Hale Shipping's interests when it neglected to seek the deletion of a "refrigeration clause" from a marine insurance policy that covered Hale's transportation of refrigerated cargo on one of its barges. Refrigerated cargo transported by Hale Shipping was allegedly damaged and the presence of this clause resulted in the marine insurance carrier denying coverage. The owner of the cargo brought a claim against Hale Shipping in the United States District Court for the Southern District of New York. In addition, a declaratory judgment action between Hale and its marine insurance carrier was brought before a federal court in Philadelphia. Hale Shipping's case against Johnson & Higgins was stayed while these cases were pending.

In the present case, Hale Shipping sought recovery for losses sustained in defending the United States District Court claims for alleged damage to the cargo in question, any potential liability for the alleged damage to the shipment, and disruption and loss of business due to inappropriate insurance coverage. At trial, the parties stipulated that Hale Shipping had incurred $50,000 worth of damages.

This case proceeded to trial before a jury sitting in the Circuit Court for Baltimore City and the jury found for Hale Shipping on both counts. The trial court entered judgment in favor of Hale Shipping in the amount of $50,000. Johnson & Higgins then filed a motion for judgment notwithstanding the verdict or for a new trial. This motion was denied and Johnson & Higgins then noted a timely appeal.

## ISSUES PRESENTED

For our review, Johnson & Higgins presents the following issues, which we have slightly rephrased and renumbered:

I. Whether the trial court erred in submitting the case to the jury in light of the evidence that Hale Shipping had failed to read its insurance policies;

II. Whether the trial court erred in declining to instruct the jury on Hale Shipping's failure to read its insurance policies;

III. (a) Whether the trial court abused its discretion in qualifying a witness for Hale Shipping as an expert;

(b) Whether the trial court abused its discretion in permitting Hale Shipping's expert witness to testify as to the complexity of the refrigeration clause, the inability of policyholders to read and understand insurance policies, and the ability of non-marine insurance experts to understand marine insurance policies;

IV. Whether the trial court erred in allowing Hale Shipping to inquire into the financial worth of Johnson & Higgins; and

V. Whether the trial court erred in denying Johnson & Higgins' motion for judgment notwithstanding the verdict.

## FACTUAL BACKGROUND

In 1975, Edwin Hale, Sr., formed a trucking company based in Baltimore City. At that time, the company employed three people. At the time of trial, the company had grown to 500 employees, most of whom worked in Baltimore, but some were located in twelve cities along the east coast from Jacksonville, Florida to Boston, Massachusetts.

In 1984, Mr. Hale decided to expand his business to include marine transport. Prior to that time, he had no experience in the marine business. At trial, Mr. Hale stated that he sought to discover "a competent group of people" who could advise him on buying barges and tug boats, a law firm and accounting firm who knew about the marine business, and an insur-

ance broker. Mr. Hale stated that he "went ahead and found out who was the best broker available." He conducted a search, speaking to people already involved in the marine business and found that Johnson & Higgins was generally considered to be one of the best, if not the best, insurance brokerage company. Mr. Hale met with representatives from Johnson & Higgins, including Carolyn Schaefer, who would later become Hale Shipping's account manager. According to Mr. Hale, these representatives informed him that their company was the best insurance broker in the country. During their meeting, Mr. Hale described what the proposed marine operation would entail. At trial, Mr. Hale testified that he retained Johnson & Higgins and that he came to rely on them for their advice. He explained that he had no expertise in marine insurance and that he had looked for an insurance agent who could give him the proper coverage for the operation he planned to run.

The first marine insurance policy obtained by Johnson & Higgins for Hale Shipping became effective on December 7, 1984. The policy ran for one year and, in ensuing years, through 1987, insurance policies were obtained by Johnson & Higgins for Hale Shipping. Ronald Gartrell, Hale Shipping's operations manager and, until May 1987, the individual responsible for its marine insurance coverage, testified that he came to rely on Johns & Higgins' expertise in obtaining the necessary insurance coverage for the corporation. He added that over the years, he frequently spoke with Ms. Schaefer regarding Hale Shipping's insurance needs. Ms. Schaefer also testified that she knew Hale Shipping had come to rely on her expertise in marine insurance.

Each of the insurance policies obtained for Hale Shipping by Johnson & Higgins included an SP–23 form, which contained clause 8(b) regarding the coverage of refrigerated cargo:

The Assurer hereby undertakes to make good to the Assured or the Assured's executors, administrators and/or successors, all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have

become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth:

Cargo

(8) Liability for loss of, or damage to, or in connection with cargo or other property, excluding mail and parcel post, including baggage and personal effects of passengers, to be carried, carried, or which has been carried on board the vessel named herein:

*Provided, however, that no liability shall exist under this provision for:*

(b) Loss of, or damage to, or in connection with cargo requiring refrigeration unless the space, apparatus and means used for the care, custody, and carriage thereof have been surveyed by a classification surveyor or other competent disinterested surveyor under working conditions before the commencement of each voyage and found in all respects fit, and unless accepted for transportation under a form of contract approved, in writing, by the Assurer.

Copies of the insurance policies, including the above quoted language, were sent to Hale Shipping, but Mr. Hale never read them. Mr. Gartrell stated that he sometimes skimmed the policies, but that he did not read them. Mr. Gartrell believed that he had probably skimmed clause 8(b). He never contacted the company's attorneys or Carolyn Schaefer, who managed Hale Shipping's account at Johnson & Higgins, regarding that clause.

In 1987, Hale Shipping began to transport cargo along a new route which ran from St. John, New Brunswick, Canada to New York. This route would also include, for the first time, Hale Shipping's transport of refrigerated cargo. Initially, Hale Shipping chartered a container ship, a self-propelled vessel, called the *Lanette*.[1] Mr. Hale explained that he had

---

1. We note that the name of this ship is spelled *"Lynette"* in the trial transcripts, but is spelled *"Lanette"* on the insurance policies. We adopt the spelling used on the policies.

decided to charter a ship and its crew because a container ship is much faster than a tug and barge.

In May 1987, Hale Shipping received a letter from its attorneys advising Hale that, in light of a recent federal court decision, the corporation should "carefully examine" the terms of any insurance coverage it may have obtained in connection with the charter of the *Lanette* "to ensure that the coverage for damage to reefer[ [2]] cargoes is very broadly worded." Mr. Hale testified that he gave the letter to Johnson & Higgins "to make sure that this was cleared up and we had the proper coverage." According to Mr. Hale, the existing charter policy was amended by deleting clause 8(b) from the SP–23 form, a change for which Hale Shipping had to pay an additional premium. Mr. Gartrell also testified that after communications with Johnson & Higgins, clause 8(b) was deleted from the coverage of the *Lanette*.

Regarding the letter from Hale Shipping's attorneys, Mr. Gartrell also testified that he faxed a copy of it to Ms. Schaefer at Johnson & Higgins. Mr. Gartrell further testified that the letter received from the attorneys commented that Hale Shipping should contact the attorneys if it wished to have them review Hale's insurance policy to make sure it covered the corporation's potential liabilities under the charter. Mr. Gartrell did not know if a copy of the insurance policy was ever sent to the attorneys.

Ms. Schaefer testified that it was not until May 1987 that she became aware that Hale Shipping was transporting refrigerated cargo and that in all her prior discussions with representatives of the corporation, she had never been advised that Hale Shipping would be carrying such cargo. Regarding the coverage on the *Lanette*, Ms. Schaefer stated that on May 21, 1987, she received the facsimile transmission of the attorneys' letter to Hale Shipping. After reading the letter, Ms. Schaefer contacted an underwriter and discussed the clause 8(b) for

---

**2.** Mr. Hale explained that the term "reefer" referred to refrigerated containers, which have generators on the front to keep their contents cold or frozen.

the *Lanette* as it seemed unfair to ask Hale Shipping to be responsible for the surveys on the ship when Hale was not in charge of the vessel. Ms. Schaefer testified that the underwriter agreed with her and consented to the deletion of clause 8(b), but the underwriter required that the owner of the vessel monitor the temperature of the refrigerated containers during the course of the voyage. Specifically, the policy called for a twenty-four hour watch of the refrigerated containers and the keeping of a temperature log. Ms. Schaefer telephoned Mr. Gartrell to inform him of her discussions. She sent Gartrell a letter dated June 8, 1987 regarding the coverage of the *Lanette*. The final paragraph of the letter read, in part: "I explained to underwriters that you have no control over the owner's having the vessel surveyed and he agreed to delete the exclusion provided the charter agreement includes the reefer clause...." Mr. Gartrell testified that he received the letter and forwarded it to Steven Crouch, an employee of Hale Shipping, who was then handling Hale Shipping's insurance coverage.

At the time clause 8(b) was deleted from the policy covering the *Lanette*, Ms. Schaefer took no action to have the clause deleted from Hale Shipping's tug and barge insurance policy. She testified that she did not do so as Hale Shipping was not "carrying any refrigerated containers on their fleet." According to Ms. Schaefer, not until late September or early October did anyone from Hale Shipping contact her regarding clause 8(b) as it pertained to Hale's tug and barge operation.

In the fall of 1987, Hale Shipping decided to change from the *Lanette* to a tug and barge, the *Boston Trader*, since the corporation was not carrying as much cargo as expected on the ship. The barge, the *Boston Trader*, was owned by Hale Shipping and was to be towed by Renaissance Towing, an independent towing firm. On August 24, 1987, Mr. Gartrell notified Johnson & Higgins that the *Lanette* was going off charter, that they would be using a tug and barge instead, and asked Johnson & Higgins to make the appropriate changes to the insurance policy. At that time, Mr. Gartrell believed that

the coverage for refrigerated cargo carried by the *Boston Trader* would be the same as it had been for the *Lanette.*

When notified that the *Boston Trader* would replace the *Lanette* on the St. John to New York route, Ms. Schaefer did not ask the underwriter to delete clause 8(b). Ms. Schaefer explained that she did not do so as Hale Shipping "knew the surveys were supposed to be done." She also stated that she assumed that the surveys were being done.

By letter dated September 21, 1987, Johnson & Higgins notified Hale Shipping that the insurance policy had been amended to cover the *Boston Trader.* On September 16, 1987, however, the *Boston Trader* had arrived in New York with a refrigerated cargo of herring roe, which appeared to have thawed and spoiled. The voyage was scheduled to have lasted approximately seventy hours and the refrigeration equipment was last checked thirty-five hours prior to arrival in New York. Hale Shipping filed an insurance claim, which was denied as the necessary refrigeration surveys had not been conducted. Hale Shipping was then sued by the company for whom it had transported the cargo.

Mr. Hale testified that it would have been impractical for the company's operation to have independent surveys conducted on the individual refrigeration systems prior to each voyage, as arrivals were not an exact science. The port of St. John has extreme tides, which limit access to the port, and the weather conditions can be severe, which affects the loading of vessels. On January 28, 1988, Hale Shipping again paid an additional premium to have clause 8(b) of the SP-23 form amended as to the tug and barge operation.

Mr. Hale also testified that he never received any telephone calls from Ms. Schaefer regarding the risks to the corporation of having clause 8(b) in the policy. He stated that the refrigerated cargo was the "premium cargo" that Hale Shipping was carrying and that this cargo would make the maritime operation viable and profitable. He explained that it was a large part of the operation and that it was also the most sensitive because of the value of the cargo.

Ms. Schaefer testified that in late September or early October, Hale Shipping contacted her about deleting clause 8(b) from the insurance policy. She contacted the underwriter who agreed to cover the cargo with deletion of the clause. Ms. Schaefer subsequently received a letter from the underwriter, who explained that he would agree to the deletion of the clause provided an additional premium was paid and certain other conditions were met. By letter dated October 19, 1987, Ms. Schaefer forwarded this information to Mr. Gartrell. According to Ms. Schaefer, at that time, she had not been informed by Hale Shipping of any loss of cargo on the *Boston Trader*. The underwriter then inspected Hale Shipping's operation and declined to cover the transportation of any refrigerated cargo. Upon receipt of a letter conveying that information, Ms. Schaefer contacted Mr. Gartrell. Eventually, the underwriter agreed to delete clause 8(b) from the policy. According to Ms. Schaefer, it cost Hale Shipping an additional premium of $12,000 annually to delete the clause.

Edwin Cave was qualified as an expert witness in the areas of marine insurance coverage and the obligations of brokers and underwriters. He was permitted to testify, over objection, that clause 8(b), which he stated was designed to cover self-propelled vessels, was impractical for a tug and barge operation. Mr. Cave also opined that an insurance broker has a duty to advise a client about risks within a maritime policy, which are very complex. Mr. Cave believed that clause 8(b) was one of those complex clauses that would require explanation by the insurance broker. Mr. Cave further opined that certain clauses are very difficult to understand unless a person has training reading marine insurance policies. He stated that the broker should advise the client about their duties and liabilities under clause 8(b). Mr. Cave also stated that the *Boston Trader* should have been substituted for the *Lanette* under the same terms and conditions as the *Lanette* had been operating under, *i.e.,* the deletion of the clause 8(b).

We will include additional facts as necessary in our discussion of the issues presented.

## DISCUSSION

### I.

Johnson & Higgins claims that Hale Shipping's failure to read the insurance policies it had received from 1984 to 1987, or its limited precaution of merely skimming the policies, including the policy covering the *Lanette,* and its resultant failure to ask Johnson & Higgins to remove clause 8(b) from the SP–23 form is a complete defense, as a matter of law, to the negligence and breach of contract actions. In support of its position, Johnson & Higgins refers us to *Twelve Knotts Ltd. Partnership v. Fireman's Fund Ins. Co.,* 87 Md.App. 88, 589 A.2d 105 (1991), in which the insured's failure to read the policy doomed its negligence and breach of contract actions. Johnson & Higgins also contends that although Hale Shipping had not received the insurance policy for the *Boston Trader* prior to the incident in question, in light of its three years of failing to read the policies, it cannot now claim that it would have read and rejected the policy if it had been received before the loss.

We begin by examining the *Twelve Knotts* case. There, a limited partnership was formed as a real estate holding company. When various insurance policies were due to expire, the partnership's executive committee had its executive director prepare a request for proposal to solicit replacement policies. The proposal sought, *inter alia,* a three-year insurance policy for property and liability insurance at an annual premium, payable in periodic installments, but guaranteed not to increase during the three-year period. A copy of the request was sent to Commercial Lines, a corporate insurance broker, who, in turn, submitted a proposal involving a policy from Fireman's Fund Insurance Company. Under the proposal, the premium due could be paid in twelve monthly installments, but the proposal said nothing as to a three-year guarantee of the premium.

In all, the executive committee received four responses to its request. Those four proposals were summarized in a document prepared by the partnership's executive director.

The proposal submitted by Commercial Lines was "far superior" to the other three. 87 Md.App. at 92, 589 A.2d 105. The executive director's document also included the notation that the annual premium under the Commercial Lines proposal was guaranteed for three years and evidence was presented that the president of Commercial Lines had conveyed that information to the director.

The partnership's executive committee considered the four proposals, but as the proposal from Commercial Lines was 35% less expensive than the other three and was the only one to offer a three-year rate guarantee, there was little doubt as to the outcome of the decision to be made. The committee elected to place the insurance through Commercial Lines. That same day, Commercial Lines issued a binder from Fireman's Fund Insurance Company for the insurance. The binder listed a premium, but stated nothing about whether that rate was guaranteed. One month later, when Commercial Lines ordered the permanent policy, it requested the guarantee. The policy issued by a stock company embodied in Fireman's Fund provided that if the premiums for the three-year period were not paid in advance, the premium would be calculated annually in accordance with the company's rates. The policy also contained an integration clause by which the limited partnership agreed that the policy embodied all agreements between the partnership and the insurance company.

Two months after receiving the policy, the president of Commercial Lines forwarded it to the limited partnership, but mentioned nothing about the absence of the three-year rate guarantee or the need to pay the full 3 year premium at the inception of the policy in order to obtain a fixed premium option. The partnership's executive director never read the policy, nor did he refer it to any of the partners.

The limited partnership paid the first year's premiums on a monthly basis. At the end of the first year, the insurer attempted to cancel the policy, but was unable to do so as the policy was for three years. The insurer then dramatically increased the premium and the limited partnership obtained

its insurance elsewhere for a cost, over the next two years, it claimed was $223,087 above the rate it thought had been guaranteed.

The limited partnership brought an action against the insurer and Commercial Lines alleging, *inter alia*, negligence and breach of contract. The limited partnership argued that although the non-conformance of the policy would have been readily discovered if it had read the policy, the partnership was entitled to rely on Commercial Lines having properly performed its duty and was not required to read the policy to ensure that it complied with the underlying contract. This Court held that the breach of contract claim must fail. We explained that "[b]y receiving the policy and remaining silent until the end of the policy year, [the limited partnership] is deemed to have accepted the policy with the non-conforming provision in it." 87 Md.App. at 105, 589 A.2d 105. In reaching that conclusion, we adopted a rule, that provides:

"[W]hen the insured accepts a policy, he accepts all of its stipulations, provided they are legal and not contrary to public policy. Where changes from the application appear in the delivered contract, under a more stringent doctrine the insured has a duty to examine it promptly and notify the company immediately of his refusal to accept it. If such policy is accepted or is retained an unreasonable length of time, the insured is presumed to have ratified any changes therein and to have agreed to all its terms."

*Twelve Knotts*, 87 Md.App. at 104, 589 A.2d 105 (quoting 12 J. Appleman, *Insurance Law and Practice*, § 7155). We also concluded that the partnership's negligence claim failed for the same reason. Judge Wilner, then Chief Judge of this Court, wrote: "[The partnership] had a duty to read the policy when it was delivered. If, as it now contends, the three-year premium guarantee was a material element, its failure to do so under the circumstances evident here must be regarded as negligent. The negligence claim therefore founders on the shoals of contributory negligence." *Id.* at 105, 589 A.2d 105 (citations omitted).

In the present case, Hale Shipping placed a much greater degree of justifiable reliance upon Johnson & Higgins than that placed upon Commercial Lines by the limited partnership in *Twelve Knotts*. In 1984, Hale Shipping conducted an active search for a reputable and knowledgeable maritime insurance broker on whose expertise it could rely to protect its interests as the corporation was entering a new field. Johnson & Higgins held itself out to possess such knowledge and expertise. Ms. Schaefer testified that she knew that Hale Shipping was relying on her expertise when making its insurance decisions. Indeed, when Hale Shipping received a warning letter from its attorneys, that letter was forwarded to Ms. Schaefer, who then acted on the letter by securing insurance coverage for the *Lanette* with clause 8(b) deleted from the policy. Ms. Schaefer testified that she had explained to the underwriter that Hale Shipping had no control over the crew of the chartered ship and that the survey requirement therefore was unreasonable. In addition, Mr. Gartrell had frequent contacts with Ms. Schaefer to discuss Hale Shipping's insurance needs. In contrast, in *Twelve Knotts*, the limited partnership solicited proposals and chose the insurance policy by merely accepting the lowest bid.

These distinguishing factors take the present case outside the rule adopted by this Court in *Twelve Knotts*. As a result, the trial court correctly concluded that Hale Shipping had not been contributorily negligent as a matter of law and that the breach of contract claim was not barred. The court committed no error in submitting the case to the jury.

## II.

Johnson & Higgins requested that the trial court instruct the jury on an insured's duty to read an insurance policy. The requested instruction provided:

An insured, such as Hale, has the duty to examine its insurance policy promptly when it receives it and to notify its broker or insurance company immediately if the policy or any of its terms, conditions, or exclusions are not acceptable.

Failure to do so is a defense to a contract claim against the broker. It is also evidence of contributory negligence, which is a defense to a negligence or negligent misrepresentation claim against the broker.

The court declined to so instruct the jury and, instead, gave a general instruction on contributory negligence, stating:

[C]ontributory negligence is the doing of something that a person of ordinary prudence would not do under the same or similar circumstances, or failing to do something that a person of ordinary prudence would have done under the same or similar circumstances. Contributory negligence is fault on the part of the person injured, which is a proximate cause of the injury sustained. You are instructed that the burden is on the defendant to establish by a preponderance of the evidence in this case the claim that [Hale Shipping] was at fault and that such fault was a proximate cause of any loss which [Hale Shipping] sustained.

Johnson & Higgins alleges that the trial court erred in failing to give the requested jury instruction, which, in accordance with *Twelve Knotts*, set forth Hale Shipping's duty to read the insurance policies. Johnson & Higgins further claims that under the instruction given, the jury was free to conclude that Hale Shipping was under no legal obligation to read its insurance policies or to complain about the offending provisions.

■ "A party is entitled to have his or her theory of the case presented to the jury provided that the theory is supported by the law and by the facts of the case." *Rossaki v. NUS Corp.*, 116 Md.App. 11, 23, 695 A.2d 203 (1997). *See also E.G. Rock, Inc. v. Danly*, 98 Md.App. 411, 420, 633 A.2d 485 (1993) ("trial court is required to give the requested jury instructions (1) if it correctly states the law, and (2) if the law is applicable"). In ruling

upon the propriety of denying a requested jury instruction, a reviewing court must determine whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury,

and finally whether the substance of the requested instruction was fairly covered by the instruction actually given. *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992).

As discussed in Issue I., *supra,* under the facts of this case, Hale Shipping was not contributorily negligent, as a matter of law, for failing to read the insurance policies. Nor was its failure to read the policies a bar, as a matter of law, to the breach of contract claim. Accordingly, the trial court committed no error in declining to instruct the jury that the failure to read the insurance policies defeated Hale Shipping's claims against Johnson & Higgins.

## III.

Johnson & Higgins next contends that the trial court abused its discretion in qualifying Mr. Cave as an expert witness and in permitting him to testify as to the complexity of marine insurance policies. We address each of these contentions *seriatim,* but first set forth the law regarding expert witnesses and our standard of review.

### The Testimony of Expert Witnesses

Maryland Rule 5–702 controls the admission of expert testimony and provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

"[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal." *Radman v.*

*Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977). In *Braxton v. Faber,* 91 Md.App. 391, 604 A.2d 543 (1992), this Court explained:

It is a time-honored rule of evidence that "in order to qualify as an expert, [one] should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate." *Raitt v. Johns Hopkins Hosp.,* 274 Md. 489, 500, 336 A.2d 90, quoting *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 291–99, 29 A.2d 653 (1943). Broad discretion is vested in the trial court with regard to expert testimony, and that discretion will not be disturbed on appeal absent an error of law or fact, a serious mistake, or clear abuse of discretion. We further note that objections attacking an expert's training, expertise, or basis of knowledge go to the weight of the evidence and not its admissibility.

*Id.* at 396, 604 A.2d 543 (some citations omitted).

### Did the Trial Court Abuse its Discretion in Qualifying Mr. Cave as an Expert Witness?

Johnson & Higgins contends that the trial court abused its discretion in qualifying Mr. Cave as an expert witness on the obligations of marine insurance brokers such as Ms. Schaefer. Johnson & Higgins stresses that Cave lacked experience as an underwriting broker and a frontline broker, that he had never underwritten a tug and barge operation, and that no evidence was presented that he possessed even a basic background in marine insurance coverage for a tug and barge operation. Johnson & Higgins also emphasizes that Mr. Cave had limited experience with and knowledge of form SP–23, that he did not know if the form was normally used during the 1980s for tug and barge operations, that he had never encountered a situation where the form was discussed, and that he did not know if it was common for tug and barge owners to have surveys done on refrigeration equipment before voyage.

At trial, Mr. Cave testified that he had been employed in the marine insurance field for over thirty years. In 1964, he

began working as a claims manager in Canada for the Marine Office of America Corporation (MOAC), the largest marine underwriting company in the United States. His responsibilities increased as he became an underwriter and then supervised underwriters and claims personnel. In 1973, he took over supervision of MOAC's Toronto office, which was the corporation's main underwriting office for Canada. In 1980, Mr. Cave was transferred to New York, where he became MOAC's chief underwriting officer, both in the United States and internationally. Mr. Cave was eventually named executive vice president of MOAC. Mr. Cave received a degree in marine insurance from the Charter Insurance Institute in London and had served on several professional boards of marine underwriters both in Canada and the United States.

Over the course of his employment with MOAC, Mr. Cave was responsible for negotiating with brokers on numerous issues relating to marine insurance, including the discussion and negotiation of specific marine insurance clauses to be included in policies, the appropriate scope of coverage, and the pricing of marine insurance policies. He explained that as an underwriter, he was often involved in negotiations with insurance brokers and that he had dealt with thousands of insurance brokers, sometimes as frequently as five or six times a day. He also professed familiarity with refrigeration clauses and the types of policies relating to vessels and barges. He stated that his expertise was in "marine coverages, both from a risk point of view, policy construction, and claims arising from that."

Mr. Cave's education and work experience qualified him as an expert in the field of marine insurance. An individual with Mr. Cave's experience does not need to have worked as an insurance broker or to have underwritten tug and barge operations to be able to explain the workings of the marine insurance industry, including the relationship between the insured, the insurance broker, and the underwriter. As we explained in *Miller v. Montgomery County,* 64 Md.App. 202, 212, 494 A.2d 761, *cert. denied,* 304 Md. 299, 498 A.2d

1185 (1985) (quoting *Radman,* 279 Md. at 171, 367 A.2d 472) (emphasis in original), " '[W]e perceive no reason why a person who has acquired sufficient knowledge in an area should be disqualified as [an expert] . . . *merely* because he has never performed a particular procedure.' " The trial court did not abuse its discretion in qualifying Mr. Cave as an expert witness.

### Did the Trial Court Abuse its Discretion in Permitting Mr. Cave to Testify on the Complexity of Marine Insurance Policies?

Johnson & Higgins next claims that the trial court abused its discretion in permitting Mr. Cave to testify as to the complexity of clause 8(b) and the ability of individuals with no experience or training in marine insurance to read and understand marine insurance policies. Johnson & Higgins alleges that the jury did not need Mr. Cave's testimony to determine whether clause 8(b) was simple or complex as the jury would be able to make that determination based on its own reading of the clause. Johnson & Higgins also contends that as Mr. Cave had never dealt with a situation in which clause 8(b) arose for discussion, he could not provide any testimony on his experiences in dealing with clients and their inability to understand the clause. Johnson & Higgins claims that Mr. Cave's opinions were, therefore, without sufficient factual basis.

Based on Mr. Cave's vast experience in the marine insurance field, he was amply qualified to testify as to the complexity of marine insurance policies. Although the jury could examine the policy itself and determine that the clause was complex, Mr. Cave's testimony was helpful in explaining that even individuals with extensive business experience, as Johnson & Higgins claimed Mr. Hale possessed, would have difficulty understanding a marine insurance policy and, specifically, clause 8(b). Furthermore, a careful examination of Mr. Cave's testimony reveals that he was not testifying as to his experiences with clause 8(b); rather, he was testifying as to his experience with clauses of the type that was 8(b). He explained that the clause was included within an exception,

*i.e.,* that the policy states that there are certain things it will not cover and refrigerated cargo was one of those items. Mr. Cave then stated: "But within the clause it then reverses that situation subject to the [insured] taking certain action vis-a-vis a survey." He continued:

It is my belief, based on all the years I've spent in this business, that the joint policy, the hauling and machinery policy with the protection and indemnity clause section, there are two policies, there are two wordings in one policy. It is my belief that unless a person has been exposed, trained, or has actually been involved in running ships and looking at marine policies for years with input from experts, they could not understand the terminology of these policies.

I would go further. I believe that any insurance expert who had not had marine insurance training would also have considerable problems understanding what the coverages are under these policies.

Mr. Cave was clearly testifying as to the difficulty individuals have in understanding maritime insurance policies in particular that have an exception within them and then create an exception to that exception by the imposition of certain requirements. We perceive no abuse of discretion on the part of the trial court in permitting Mr. Cave to offer this testimony.

## IV.

During the cross-examination of Joan Williams, a technical assistant with Johnson & Higgins who had handled the administration of the Hale Shipping account, counsel for Hale Shipping asked if Johnson & Higgins was grossing at least $1 billion a year. Over objection, Ms. Williams responded, "I have no idea." This same question was put to Ms. Schaefer on cross-examination and she responded, over objection, "I was not aware of what their revenues were at all. You're talking 1987, correct?" Counsel for Hale Shipping began to question Ms. Schaefer regarding her deposition testimony on Johnson & Higgins gross receipts, but then withdrew the question.

Counsel then continued to question Ms. Schaefer on Johnson & Higgins' size and the following occurred:

Q: You accept as true and accurate that the company you work for is considered by you to be one of the best marine insurance brokers in the United States?

A: Well, I certainly think so and I think that's our reputation.

Q: And one of the largest?

A: Yes.

Q: And the gross revenues are very large—for the company?

A: Well, I know they are large now. I don't know what they were then.

Johnson & Higgins claims that the trial court erred in permitting Hale Shipping to inquire into its gross receipts. Johnson & Higgins argues that this evidence was irrelevant and immaterial to the issues in the case. It is further alleged that as Hale Shipping "had already established that Johnson & Higgins was the third largest insurance broker in the world, its efforts to go even further and elicit testimony of Johnson & Higgins' financial worth ... was an obvious attempt to prejudice the jury."

■ Here, the witnesses testified that they had no knowledge of Johnson & Higgins' gross revenues. Ms. Schaefer then conceded only that they were "large." Although counsel set a figure before the jury, questions and comments by counsel are not evidence. *Bell v. State,* 114 Md.App. 480, 496, 691 A.2d 233 (1997). In addition, this case does not present the danger of the jury being swayed by the allegedly large revenues of Johnson & Higgins as Hale Shipping was also portrayed as a very large corporation—both companies were successful, thriving businesses. Johnson & Higgins also presented Mr. Hale as an experienced businessman. Finally, the trial court instructed the jury that it was to decide the case fairly and impartially, that all corporations stand equal before the law, that a party's wealth or poverty of employment should not be considered, and that sympathy should not be a factor in

the verdict. As a result, any error committed by the trial court was harmless beyond a reasonable doubt. *See Harris v. Harris*, 310 Md. 310, 319, 529 A.2d 356 (1987) ("To justify reversal two things are essential. There must be error and there must be injury; and unless it is perceived that the error causes the injury there can be no reversal merely because there is error"); *Beahm v. Shortall*, 279 Md. 321, 330, 368 A.2d 1005 (1977) stating that burden of demonstrating error and prejudice is on the complaining party.

## V.

Johnson & Higgins also claims that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict. The insurance policy covering the *Lanette* required that the crew of the vessel maintain a twenty-four hour watch and a temperature log. Johnson & Higgins alleges that even if the *Lanette* policy had been applied to the *Boston Trader,* Hale Shipping would still have been in violation of the policy as the refrigerated containers carried by the *Boston Trader* were last checked thirty-five hours before the cargo arrived in New York. Since it would have been in violation of the insurance policy, its claim would have been denied. The alleged negligence of Johnson & Higgins, therefore, cannot constitute the requisite cause or proximate cause of Hale Shipping's damages.

Johnson & Higgins further claims that as it took two and a-half months of effort by its broker to delete the refrigeration clause after the request was made by Hale Shipping in the fall of 1987, the deletion of the refrigeration survey requirement could not have been accomplished before the voyage of the *Boston Trader.* Johnson & Higgins argues that as the *Boston Trader* could not have been covered by the terms of the *Lanette* policy, even if the substitution had been immediately requested, the actions of Johnson & Higgins cannot be viewed as the cause or proximate cause of Hale Shipping's loss. A motion for judgement notwithstanding the verdict "tests the legal sufficiency of the evidence." *Impala*

*Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 326, 389 A.2d 887 (1978). In *Huppman v. Tighe*, 100 Md.App. 655, 642 A.2d 309 (1994), Judge Davis writing for the Court succinctly set forth our standard of review of such a motion:

> A motion for judgment notwithstanding the verdict (j.n.o.v.) is reviewed under the same standard as a judgment granted on motion during trial. The appellate court assumes the truth of all credible evidence and all inferences of fact reasonably deducible from the evidence supporting the party opposing the motion. If there exists any legally competent evidence, however slight, from which the jury could have found as they did, a j.n.o.v. would be improper.

*Id.* at 663, 642 A.2d 309 (citations omitted).

In a negligence claim, the plaintiff must demonstrate: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 76, 642 A.2d 180 (1994). "The element of proximate causes is satisfied if the negligence is 1) a cause in fact of the injury and 2) a legally cognizable cause." *Baltimore Gas & Elec. Co. v. Lane*, 338 Md. 34, 51, 656 A.2d 307 (1995).

Proximate cause "is a concept that possesses a chameleon-like ability to defy precise categorization, and must be analyzed on a case-by-case basis." *Yonce v. SmithKline Beecham Clinical Lab., Inc.*, 111 Md.App. 124, 136–37, 680 A.2d 569, *cert. denied*, 344 Md. 118, 685 A.2d 452 (1996). In *Yonce*, Judge Eyler, writing for this Court, discussed this difficult concept and we quote liberally from that opinion in setting forth the law on proximate cause:

> Our courts have used two tests when determining whether a defendant's negligence is the cause in fact of a plaintiff's injury. Respectively, they are described as the "but for" and "substantial factor" tests. By it's nature, the "but for" test applies when the injury would not have occurred in the

absence of the defendant's negligent act. The "but for" test does not resolve situations in which two independent causes concur to bring about an injury, and either cause, standing alone, would have wrought the identical harm. The "substantial factor" test was created to meet this need but has been used frequently in other situations. The "substantial factor test" is firmly rooted in the Restatement (Second) of Torts approach to proximate cause.

§ 431. What Constitutes Legal Cause.

The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

§ 433. Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm.

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

*See Bartholomee [v. Casey,* 103 Md.App. 34, 56, 651 A.2d 908 (1995) ](compiling Maryland cases utilizing the "substantial factor" test).

Regardless of the test employed, the focus remains on the fundamental and sometimes metaphysical inquiry into the

nexus between the defendant's negligent act and the resultant harm to the plaintiff.

111 Md.App. at 138–39, 680 A.2d 569 (some citations omitted).

In the present case, Johnson & Higgins is proceeding under the assumption that the only duty it owed to Hale Shipping was to substitute the *Boston Trader* for the *Lanette.* Mr. Cave, the expert witness who testified on behalf of Hale Shipping, stated that, although they would be covered by different types of policies as the *Lanette* was a vessel and the *Boston Trader* was a barge, he believed that the *Boston Trader* should have been substituted for the *Lanette* in terms of the refrigeration protection. Mr. Gartrell also testified that he believed that the *Boston Trader* would be covered under the same terms and conditions as the *Lanette.*

 Under the facts of this case, however, the jury could conclude that the duty owed by Johnson & Higgins to Hale Shipping was not the mere substitution of the *Boston Trader* for the *Lanette.* Rather, the jury could conclude that the duty owed was to advise Hale Shipping properly of the terms and conditions of the policy in effect. Ms. Schaefer testified that she assumed that Hale Shipping knew that the refrigeration surveys had to be done and that they were being done; however, Johnson & Higgins had never advised Hale Shipping of the survey requirement.

The jury could also have concluded that Johnson & Higgins owed a duty to have clause 8(b) deleted from the coverage of the *Boston Trader* and to recognize, as Ms. Schaefer had previously done in regard to the *Lanette,* that Hale Shipping could not control the crew of the independent tug company towing the barge. Mr. Gartrell testified that he had forwarded copies of the contract with the tug company for Ms. Schaefer to review to ensure that Hale Shipping's interests were protected. This situation, although not identical to that of the *Lanette,* was similar in that the cargo was being transported by a crew over which Hale Shipping had no control, absent successful negotiation of contractual requirements similar to those imposed on the crew of the *Lanette* at

the time Hale Shipping obtained the deletion of clause 8(b) from the prior policy, other than to direct its destination. With the *Boston Trader,* these circumstances were exacerbated by the fact that the refrigerated containers would be on a barge and not a container ship. Johnson & Higgins failed to protect Hale Shipping's interests by failing to recognize the difficulty in maintaining a twenty-four hour watch over the refrigerated containers on a barge.

It is Johnson & Higgins's failure adequately to advise and protect Hale Shipping's interests, duties for which it was engaged, that were the proximate cause of Hale's loss and not the failure to substitute the *Boston Trader* for the *Lanette.* As Johnson & Higgins assumed that Hale Shipping knew that the refrigeration surveys were required and assumed that the surveys were being conducted, but never advised Hale that clause 8(b) was in the insurance policy covering the *Boston Trader,* the trial court committed no error in denying Johnson & Higgins' motion for judgment notwithstanding the verdict.

Nor do we find persuasive Johnson & Higgins' argument that even if it had attempted to substitute the *Boston Trader* for the *Lanette,* such a substitution would have taken two and a-half months to delete the refrigeration clause from the policy and could not have been accomplished within the short time frame in which the substitution occurred. Johnson & Higgins's argument fails because if it had attempted to make the substitution, it would have had to advise Hale Shipping of its inability to complete the substitution before the *Boston Trader* 's voyage and Hale Shipping would have then been aware of its increased liability.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**