STATE of Minnesota, Respondent,

v.

David Charles PIRSIG, Appellant.

No. C0–02–1688.

Court of Appeals of Minnesota.

Oct. 28, 2003.

Mike Hatch, Attorney General, St. Paul, and Brian Roverud, Faribault County Attorney, Blue Earth, for respondent.

Michael C. Davis, Special Assistant State Public Defender, St. Paul, for appellant.

Considered and decided by SHUMAKER, Judge, WILLIS, Judge, and STONEBURNER, Judge.

## OPINION

GORDON W. SHUMAKER, Judge.

This case arises out of charges that appellant David Pirsig and his father, Edward Pirsig, stole grain from Paul and Charles More during 1996, 1997, and 1998. After a seven-day trial during April 2002, the jury found appellant guilty of two counts of theft of grain by swindle, over $35,000; 25 counts of theft of corporate property; and two counts of theft. Appellant now challenges the convictions, claiming that there was insufficient evidence to support them, the district court abused its discretion in admitting certain testimony on field maps, and the district court erred in substituting an alternate juror for a juror who became ill after the court released the jury to deliberate but before actual deliberations had commenced. Appellant also filed a pro se supplemental brief, claiming that the county attorney violated Minnesota Rules of Professional Conduct and Minn.Stat. § 388.08 (2002).

## FACTS

Appellant David Pirsig and his father Edward Pirsig ceased their own farming operations because of financial problems.

At the time, the Pirsigs were under contract to deliver a certain amount of grain to Peavey Elevators. Although the Pirsigs had some carry-over grain sales in early 1996, they were not able to complete their delivery obligation and Peavey cancelled the contract.

After the Pirsigs stopped their own farming operations, they entered into a seven-year custom-farming agreement with Paul and Charles More. The Mores were sellers of fertilizer, chemicals, and crop inputs to farmers in south-central Minnesota. In the early 1990s, the Pirsigs were among their customers.

In general, the custom-farming contract allowed the Pirsigs to continue to farm and to use their own equipment, but, because of the Pirsigs' financial status, the Mores paid the upfront costs of land rental and crop inputs and paid the Pirsigs by acreage and crop. The Pirsigs were required by their contract to cultivate the land and to plant, harvest, dry, store, and deliver the grain crop. Because the Pirsigs had an existing relationship with the landowners from whom they had leased land for their own operations, the Mores authorized them to sign leases for their custom farming. Under the contract with the Mores, the Pirsigs farmed approximately 2,800 acres from 1996 through 1998.

Despite the custom-farming contract between the Pirsigs and the Mores, it was not commonly known in the local agricultural community that the Mores were financing the Pirsigs' operations. Rather, many operators of agricultural businesses believed that the Pirsigs were continuing to do their own farming. For example, David Pirsig sold grain to Midwest Soya during the early 1990s and continued to sell grain to Midwest Soya from 1996 through 1998 under the name D & D Farms. The owner of Midwest Soya believed that David Pirsig was doing his own farming under that name. The Pirsigs did not report as income the payments for grain they sold to Midwest Soya but did deposit the receipts in a bank. This grain had test weights and moisture content consistent with the grain the Pirsigs delivered on behalf of the Mores.

To help manage their fields, in 1996 the Mores installed a grain monitor in the combine the Pirsigs used to harvest the grain under the custom-farming contract. The grain monitor uses a global positioning system (GPS) to collect data on specific field locations and crop yields for those locations. The data collected from the GPS monitor can be downloaded onto a Geographic Information System (GIS) software application. The GIS takes the location data from the GPS and overlays it onto a map that identifies certain correlations—such as soil types, combine swath width, and copy yields—for a particular field location.

In 1998, the Mores learned that they were short approximately 12,400 bushels of grain. Based on information from David Pirsig, they initially believed the shortage was caused by grain damage and was within an acceptable 10% margin of error based on a large grain yield. The Mores eventually began to suspect that the Pirsigs had stolen the grain.

The Mores collected the data from the combine's grain monitor and had it analyzed. The analysis showed that the monitor had been shut off at various times during combine use across various fields. The analysis also revealed that the swath-width setting on the monitor, registering the width of the stroke of the combine's cutting blade, had been changed at various times without a corresponding change to the actual width of the combine blade. The changed setting resulted in an alteration of the crop-output data and actually lowered the crop-yield data.

At trial, David Pirsig contended that the monitor was faulty and that he and his father had told the Mores of the monitor problems. The Pirsigs' cousin, who operated the combine, testified that the monitor had broken down a couple of times and had lost communication with the satellite. He also testified that the Pirsigs instructed him to change the swath-width setting without making a corresponding change to the combine's blade. An acquaintance of the Pirsigs testified that, after the 1998 harvest, David Pirsig said that the repayment of a $10,000 loan David Pirsig obtained from the acquaintance "had to wait until Mores started hauling before [David Pirsig] could get away with some," and "last year [David Pirsig] got away with $40,000."

Ultimately, David Pirsig was found guilty by a jury of two counts of theft of grain by swindle, over $35,000; 25 counts of theft of corporate property; and two counts of theft. This appeal followed.

## ISSUES

1. Is the evidence sufficient to prove beyond a reasonable doubt that appellant committed theft by swindle, conspiracy to commit theft by swindle, theft of corporate property, and theft over $2,500?

2. Did the district court abuse its discretion by admitting certain expert testimony?

3. Is it reversible error for the court to replace a principal juror with an alternate before deliberations had begun and after defense counsel informed the court that appellant consented to the substitution even though appellant did not personally appear and express his consent?

4. Did the county attorney violate either the Minnesota Rules of Professional Conduct or Minn.Stat. § 388.08 (2002) by acting with a conflict of interest?

## ANALYSIS

### I

▬ In determining whether the evidence is sufficient to support a conviction, we view that evidence in a light most favorable to the verdict and assume that the jury disbelieved any evidence contrary to that verdict. *State v. Chomnarith,* 654 N.W.2d 660, 664 (Minn.2003). On appeal, we do not retry the case, but review the record to determine whether the evidence was sufficient to permit the jurors to reach their verdict. *State v. Schneider,* 597 N.W.2d 889, 895 (Minn.1999). We will not overturn the jury's verdict if, "giving due regard to the presumption of innocence and to the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offenses." *Chomnarith,* 654 N.W.2d at 664.

▬ Circumstantial evidence is given the same weight as any other evidence as long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt. *State v. Gates,* 615 N.W.2d 331, 337 (Minn. 2000). To succeed in a challenge to a conviction solely based on circumstantial evidence, a convicted person must point to evidence within the record that is consistent with a rational theory other than guilt. *Id.* at 338. However, "possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *Id.* (quoting *State v. Ostrem,* 535 N.W.2d 916, 923 (Minn.1995)).

▬ A person commits a theft when he "intentionally and without claim of right takes, uses, transfers, conceals or retains possession of movable property of another without the other's consent and with intent

to deprive the owner permanently of possession of the property." Minn.Stat. § 609.52, subd. 2(1) (1996). A theft by swindle occurs when a person, "whether by artifice, trick, device, or any other means, obtains property or services from another person." Minn.Stat. § 609.52, subd. 2(4) (1996). Theft by swindle requires an affirmative intent to defraud. *State v. Flicek,* 657 N.W.2d 592, 598 (Minn.App.2003). Theft of corporate property occurs when a person, "with intent to defraud, diverts corporate property other than in accordance with general business purposes." Minn.Stat. § 609.52, subd. 2(15) (2000). Conspiracy to commit theft by swindle requires that a person who conspires with another to commit the crime "does some overt act in furtherance of such conspiracy." Minn.Stat. § 609.175, subd. 2 (1996).

David Pirsig argues that the state failed to present sufficient evidence of his guilt. He argues that the state's primary evidence that D & D Farms sold grain belonging to the Mores was based on inaccurate and unreliable data from the combine grain monitor. He argues that the grain-monitor data "does not establish the value of the resulting loss" because it could not take into account such variables as the existence of weeds, putting the combine into reverse, or change in field terrain. Finally, he argues that his statements to an acquaintance that appellant "had to wait until Mores started hauling before [appellant] could get away with some" and "last year [appellant] got away with $40,000 or 40,000" were ambiguous and could just as easily mean "spinning some yarn to a creditor to delay" payment.

The state's evidence included testimony and documentary evidence that explained the combine monitor data; showed that David Pirsig sold grain to several elevators under the name of D & D Farms during 1996 to 1998 and at the same time had filed financial documents showing that D & D Farms had no grain on hand or crop for sale; showed that David Pirsig's tax returns did report grain sales in 1996 and 1997; showed that David Pirsig negotiated a settlement with Peavey because the Pirsigs could not deliver in 1996 the amount of grain required under their grain-delivery contract; showed the dollar amounts of the grain sales received by D & D Farms; and indicated that the test weights and moisture contents of the D & D-delivered grain were consistent with the grain that the Pirsigs delivered on behalf of the Mores' custom-farming operation.

Although there is evidence from the combine operator that the monitor had some operational problems, the person who analyzed the monitor data testified at trial as to how he retrieved the data and used that data to determine field-crop yields based on monitor swath widths. He testified that the data showed instances where the yields in the middle of many of the fields would drastically change. He did not testify to the actual yields generated. He also testified that in further review of the data he found that the swath width on the monitor had been changed. His testimony regarding the change to the swath-width setting on the monitor was corroborated by the combine operator, who also testified that the Pirsigs told him when to switch the swath-width setting on the monitor but that he did not make a corresponding change to the combine blade.

When the combine monitor data is viewed together with the state's significant and substantial evidence, such as the Pirsigs' financial statements and known sales of grain under the name of D & D Farms, a jury could have reasonably concluded that David Pirsig was guilty of theft, theft of corporate property, and theft by swindle. And we leave to the jury's discretion

any credibility determinations relating to the testimony by an acquaintance of David Pirsig that David Pirsig "got away with 40,000." *See State v. Cooper*, 561 N.W.2d 175, 179 (Minn.1997) (stating that jury is in the best position to evaluate a witness's credibility and to weigh the evidence). Based on our review of the evidence as a whole and in the light most favorable to the jury's decision, we conclude that David Pirsig has not shown that his theory of innocence makes the state's theory of guilt unreasonable. The evidence is sufficient to sustain the jury's finding of guilt.

## II

■ David Pirsig argues that the district court abused its discretion by admitting expert testimony regarding data collected by the combine monitor. He argues that the monitor did not accurately record crop yield and the federal government did not recognize yield data from these types of monitors for purposes of issuing crop insurance; therefore, such expert testimony was confusing to the jury and not helpful in determining whether appellant stole grain.

The state argues that David Pirsig failed to move before trial for a hearing to challenge the scientific reliability of the combine grain monitor. The district court determined that, under *State v. Bauer*, 512 N.W.2d 112, 115 (Minn.App.1994), *aff'd* 516 N.W.2d 174 (Minn.1994), such a hearing must be held at the pretrial stage and that, because trial had already begun, David Pirsig's challenges to the monitor's scientific reliability could be explored on cross-examination. *See id.* (stating that a party waives the right to attack the general scientific credibility of emerging scientific techniques at trial when he fails to move to suppress the evidence before trial).

David Pirsig lost a procedural opportunity to challenge the scientific reliability of the combine grain monitor, but never waived the right to challenge the probative value of the evidence. The district court allowed cross-examination, and David Pirsig's attorney had full opportunity to explore and challenge the reliability of the combine monitor.

■ A district court has discretion in deciding whether to admit evidence. *State v. Martin*, 614 N.W.2d 214, 223 (Minn.2000). The district court also has the discretion to determine whether to admit an expert's opinion. *State v. Ture*, 632 N.W.2d 621, 631–32 (Minn.2001). To be admissible, expert testimony must be relevant and must be helpful to a juror in understanding evidence in a subject matter in which an inexperienced juror may be unable to form a correct judgment without an expert's testimony. *State v. Ritt*, 599 N.W.2d 802, 811 (Minn.1999). We perform a de novo review to determine whether a particular technique is generally accepted in the relevant scientific field, and review under an abuse-of-discretion standard whether an expert witness is qualified and the testimony helpful to the jury. *Goeb v. Tharaldson*, 615 N.W.2d 800, 814 (Minn. 2000).

The record here indicates that the GPS technology has existed for many years and has been used in the agricultural community since 1992. The expert witness testified that he has been trained to analyze the software data that is produced by the GIS software system and has done that for about five years. The state used this testimony to show that David Pirsig changed the monitor's swath widths across various fields, and that this alteration resulted in a decreased crop-yield report. Such evidence would be helpful to a juror. We conclude that the district court did not

abuse its discretion by allowing the combine-monitor testimony.

## III

■ David Pirsig also argues that the district court committed reversible error when it substituted an alternate juror for a regular juror who had become ill. The court had discharged the alternate jurors, but the jury had not begun deliberating when one member became ill. David Pirsig authorized his attorney to consent to the substitution of an alternate but contends he was not physically present in the courtroom to personally state his consent. He contends that it was error for the court to make the substitution outside his personal presence.

■ Minnesota law requires that a "defendant be present at 'every stage of [his] trial.'" *State v. Charles*, 634 N.W.2d 425, 432 (Minn.App.2001) (quoting Minn. R.Crim. P. 26.03, subd. 1(1)). *See generally State v. Givens*, 544 N.W.2d 774, 777 (Minn.1996). (implying defendant be present at sentencing); *Vernlund v. State*, 589 N.W.2d 307, 310 (Minn.App.1999) (implying defendant be present when entering a plea); *State v. Thornblad*, 513 N.W.2d 260, 263 (Minn.App.1994) (implying defendant be present when waiving right to an attorney). This includes the right to be present when the district court responds to a jury's questions during deliberations. *State v. Sessions*, 621 N.W.2d 751, 755–56 (Minn. 2001).

■ A defendant may, however, waive a variety of his rights, such as his right to be sentenced under the guidelines, his "*Miranda* rights, [his] right to a jury trial, and [his] right to be present at trial." *Givens*, 544 N.W.2d at 777. A defendant can also waive the right to be present when a court responds to the jury's various requests. *Charles*, 634 N.W.2d at 432.

■ When a right is waived, "the decision to waive is personal and is not one for counsel to make but one for the defendant to make after consultation with counsel." *Id.* Absent a rule or precedent to the contrary, a defendant need not be physically present in the courtroom for every matter if he has consulted with his attorney and reached a decision, authorized his attorney to proceed without his presence, and the attorney confirms on the record his client's decision.

In this case, the district court discharged the three alternate jurors after reading the final jury instructions. When the 12 principal jurors retired for deliberations, one of the principal jurors became ill almost immediately and needed medical assistance. The record clearly indicates that the 12 principal jurors had not yet begun deliberations when one of them became ill.

The district court recalled the first alternate juror with the consent of counsel for the state and counsel for appellant. The court questioned the alternate and determined that she had not discussed the case with the other alternates or with anyone else after being discharged. The record is unclear whether David Pirsig was present in the courtroom when the district court questioned and substituted the alternate juror. But the record confirms, through the statements by David Pirsig's trial counsel, that David Pirsig agreed to substitute an alternate juror for the ill juror.

■ We conclude that the district court did not err. A defendant can waive his right to be present when an alternate juror is substituted if the defendant has delegated authority to his attorney to agree to the substitution. There is no rule requiring a defendant to be physically present upon juror substitution. The only requirement would be that the defendant

consented personally to the alternate-juror substitution. In this case, David Pirsig personally consented to the substitution and delegated authority to his attorney to agree to the substitution, and his attorney indicated on the record that David Pirsig consented to an alternate. *Cf. Charles,* 634 N.W.2d at 432–33 (finding district court erred where defendant's attorney made a unilateral decision that defendant's presence was not necessary when the court responded to jury requests during deliberations on substantive legal matters). Although it may be a better practice for the district court to question the defendant on the record, we find no error or prejudice under the current circumstances.

## IV

■ We have reviewed appellant's pro se claims, including whether the county attorney violated either the Minnesota Rules of Professional Conduct or Minn. Stat. § 388.08 (2002) by acting with a conflict of interest. The Board of Professional Responsibility is the appropriate forum to determine whether any rules of professional conduct have been violated. *Kerkhoff v. Kerkhoff,* 400 N.W.2d 752, 759 (Minn.App.1987), *review denied* (Minn. Mar. 25, 1987), *review denied* (Minn. Apr. 23, 1987). And we have determined that his statutory conflict-of-interest claim is without merit.

## DECISION

The record contains sufficient evidence for the jury to convict David Pirsig of theft by swindle, theft of corporate property, and theft. The district court did not abuse its discretion in admitting testimony relating to data produced by the combine grain monitor. The district court did not err in substituting an alternate juror for an ill juror after the jurors were dismissed but before deliberations had begun because

David Pirsig, although not personally present in the courtroom, personally consented to the substitution.

**Affirmed.**