Terry Lynn BROWN, Appellant.

v.

The STATE of Texas, Appellee.

No. 05–04–00480–CR.

Court of Appeals of Texas,
Dallas.

May 23, 2005.

Deric King Walpole, Boyd Veigel, P.C., McKinney, for Appellant.

John R. Roach, Collin County Dist. Atty., and John A. Stride, Asst. Dist. Atty., McKinney, for State.

Before Justices BRIDGES, O'NEILL, and MAZZANT.

## OPINION

Opinion by Justice MAZZANT.

Terry Lynn Brown appeals his conviction for murder. The jury found appellant guilty, and appellant agreed to a sentence of life imprisonment and a $10,000 fine. Appellant brings six issues asserting (a) the trial court erred by denying appellant's motion to dismiss for lack of a speedy trial, (b) the trial court erred by admitting certain scientific evidence, and (c) cumulative error warranted a new trial. We affirm the trial court's judgment.

## FACTUAL BACKGROUND

The evidence before the jury, viewed in the light most favorable to the verdict, showed the following.

In November 1993, appellant worked as a truck driver for a trucking company in New Jersey. On November 2, appellant picked up a load in Seacaucus, New Jersey to take it to Plano, Texas. The trucking company's trucks were equipped with both global positioning system (GPS) receivers which determined the truck's geographic position, and transmitters, which relayed the truck's position to the trucking company every few seconds to every few hours, but mostly once an hour. The trucking company kept records of these transmissions. The GPS records for the truck issued to appellant showed appellant stopped overnight in Jersey City, New Jersey. The complainant, Christine Franklin, lived in Jersey City. The GPS records showed appellant then drove through New Jersey, Pennsylvania, Virginia, Tennessee, and Arkansas into Texas

and delivered his load in Plano at about 7:36 p.m. on November 4. The GPS records showed he spent a couple of days in the Dallas area and that he was in Richardson from 11:25 p.m. on November 5 until 10:57 p.m. on November 6. Appellant had family in Richardson. In the evening on November 6, Franklin's body was found in a park in Richardson. Franklin had been strangled to death. A shoelace, the ends of which had been pierced by a wire, was wrapped around Franklin's neck, and the wire had been used to tighten the shoelace. The lead investigator, Richardson Police Department Sergeant Daniel Nors, examined the GPS records, and testified that "the truck and [appellant] were in the location in the city of Richardson when the body was deposited."

DNA analysis of a cigarette butt found next to Franklin's body showed DNA consistent with both appellant as a major contributor of the DNA and Franklin as a minor contributor of the DNA. The DNA analyst, Dawn Ratliff, testified that the frequency of an unrelated African–American (both appellant and Franklin are African–American) having the same DNA pattern as that found on the cigarette butt consistent with the major contributor's DNA was approximately one in 118 billion. DNA analysis of the material found under Franklin's fingernails excluded Franklin but was consistent with appellant's DNA. DNA analyst Anjali Swienton testified that the frequency within the unrelated African–American population of that DNA pattern was approximately one in 5.9 million. DNA analysis of a sock found stuffed in Franklin's mouth showed the DNA found on the sock was consistent with Franklin being the major donor of the DNA and appellant being a minor donor of DNA found on the sock. The analysis of DNA on the sock also showed it was possible DNA may have been contributed by an

unknown third person. Analysis of combings from Franklin's head hair revealed the presence of a brown Caucasian pubic hair.

## SPEEDY TRIAL

 In his first issue, appellant contends the trial court erred in denying his motion to dismiss the indictment for denial of his Sixth Amendment right to a speedy trial. The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. CONST. amend VI. This right is fundamental and is imposed on the states through the Due Process Clause of the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

The evidence before the trial court on this issue showed that on November 10, 1994, about one year after Franklin's body was found, Dallas police officers arrested appellant on a warrant for crimes related to the murder of his mother, Sandra Brown. On November 15, 1994, appellant gave a written statement explaining that another truck driver strangled Franklin in his presence in New Jersey on November 2, 1993, and appellant, who had agreed to dispose of Franklin's body, drove to Richardson where he dumped the body. A Richardson magistrate issued a warrant for appellant's arrest related to Franklin's murder on December 15, 1994. The Richardson police forwarded the warrant to Dallas County, which had custody of appellant, and Dallas County placed a "hold" on appellant. On December 29, 1994, the Richardson police filed the case against appellant relating to Franklin's murder with the Collin County District Attorney's Office. On March 27, 1995, the Collin County District Attorney's Office refused

the case. The district attorney filed a document stating, "The charge listed below in regard to the defendant named will not be prosecuted by this office. If in custody, the defendant should be RE-LEASED OF THE CHARGE LISTED." The district attorney refused the case on the ground that jurisdiction for Franklin's murder lay in Suffolk County, New Jersey instead of Collin County, Texas.[1] The Richardson police contacted officials in New Jersey, who said jurisdiction lay in Collin County, Texas because that is where Franklin's body was found. The Collin County District Attorney's Office rejected the case again on March 30, 1998 due to concerns about jurisdiction. In 2002, the Richardson police again presented the case to the district attorney's, and this time the Collin County District Attorney accepted the case. Appellant was indicted for Franklin's murder on May 1, 2002, and his case came to trial on March 15, 2004. After his release on March 27, 1995 from the charge of Franklin's murder, appellant remained incarcerated on other charges, and he has been continuously incarcerated since his arrest in November 1994. He was sentenced to life imprisonment in 1997 for a murder conviction in Cooke County.

In *Barker v. Wingo*, the Supreme Court laid out the requirements for proving a violation of the right to a speedy trial. 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In that case, the defendant was arrested shortly after the crime on July 20, 1958, was indicted on September 15, 1958, and his trial began on October 9, 1963. *Id.* at 516–18, 92 S.Ct. 2182. The Court referred to the delay between the defendant's arrest and his trial as the period of Sixth Amendment right-to-speedy-trial concern. *See id.* at 520, 533, 92 S.Ct. 2182. Where arrest and charging occur in

1. *See* TEX. PEN.CODE ANN. § 1.04(a), (b) (Vernon 2003) (territorial jurisdiction); TEX.CODE CRIM. PROC. ANN. art. 13.05 (Vernon 1979) (venue over homicide committed outside Texas).

close succession, the test set out in *Barker* is appropriate. *See, e.g., Harris v. State,* 827 S.W.2d 949 (Tex.Crim.App.1992) (*Barker* test applied in case where defendant arrested and taken to police station where capital murder accusation was explained to him). However, when charges are initially dismissed, and no formal charges are pending, the Supreme Court has made clear that the Speedy Trial Clause provides no protection.

 In *United States v. MacDonald,* the defendant, a captain in the United States Army, was suspected of murdering his wife and children. 456 U.S. 1, 3–4, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). On April 6, 1970, the defendant was confined to quarters, and he was formally charged in the military court with murder on May 1, 1970. *Id.* at 4, 102 S.Ct. 1497. On October 23, 1970, all charges against the defendant were dismissed, and on December 5, 1970, the defendant was honorably discharged from the army. *Id.* at 5, 102 S.Ct. 1497. Although all military charges had been dismissed and the defendant had been discharged, the investigation against the defendant continued, and a grand jury returned an indictment against him in January 1975. *Id.* The defendant moved to dismiss the indictment on the ground that the delay in bringing him to trial violated his Sixth Amendment right to a speedy trial. *Id.* In *MacDonald,* the Supreme Court explained the different protections provided by the Fifth Amendment's Due Process Clause and the Sixth Amendment's Speedy Trial Clause. *Id.* at 7–9, 102 S.Ct. 1497. The Due Process Clause, not the Speedy Trial Clause, provides protection for any delay before an arrest or indictment; the Speedy Trial Clause provides protection for delay between arrest and indictment and between indictment and trial. *Id.* at 7, 102 S.Ct. 1497. However, "[o]nce charges are dismissed, the

speedy trial guarantee is no longer applicable." *Id.* at 8, 102 S.Ct. 1497. Any delay between the dismissal of one set of charges and the bringing of another implicates the Due Process Clause, not the Speedy Trial Clause. *Id.* at 7, 102 S.Ct. 1497. Thus, the Court held the period between the dismissal of the defendant's military charges and his subsequent indictment in the civilian courts was not subject to the protections of the Speedy Trial Clause even though the defendant remained a suspect during this period. *Id.* at 10, 102 S.Ct. 1497. "Once the charges instituted by the Army were dismissed, MacDonald was legally and constitutionally in the same posture as though no charges had been made." *Id.*

 "[T]he Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution." *Doggett v. United States,* 505 U.S. 647, 655, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). In this case, appellant came under the "confines of a formal criminal prosecution" for Franklin's murder on December 15, 1994 when the arrest warrant was delivered to the Dallas County officials and a "hold" was placed on appellant. However, when the "hold" was released and all charges were dismissed on March 27, 1995, "the speedy trial guarantee [was] no longer applicable." *MacDonald,* 456 U.S. at 8, 102 S.Ct. 1497. From then until his indictment on May 1, 2002, the Speedy Trial Clause had no application.

In the trial court and in this Court, appellant complains only of the pre-indictment delay. Accordingly, we need not consider whether any post-indictment delay violated the Speedy Trial Clause. Because the pre-indictment delay was not subject to the protections of the Speedy Trial Clause, the trial court did not err in denying appellant's motion to dismiss. Appellant's motions and arguments in the

trial court and his briefing on appeal do not assert that the pre-indictment delay violated the Due Process Clause. Accordingly, that issue is not before us. *See West v. State*, 121 S.W.3d 95, 114 (Tex.App.-Fort Worth 2003, pet. ref'd) (failure to object on ground of violation of constitutional right to due process waives that ground); *King v. State*, 17 S.W.3d 7, 23 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd) (op. on motion for reh'g) (failure to brief due process claim on appeal waives error). We overrule appellant's first issue.

## SCIENTIFIC EVIDENCE

In the next four issues, appellant complains of the trial court's admission of scientific evidence, specifically GPS records showing the location of appellant's truck at various times and testimony concerning DNA population frequency statistics.

■ Rule of evidence 702 governs the admission of expert scientific evidence:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex.R. Evid. 702. Before admitting expert scientific testimony, the trial court must determine whether the testimony is sufficiently reliable and relevant to help the jury reach accurate results and whether the expert witness is competent to testify as an expert on the subject for which his testimony is proffered. *See id.; Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App. 1992). In *Kelly*, the court of criminal appeals applied "common sense" and determined that for any scientific evidence to be admissible, it must satisfy three criteria: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly*, 824 S.W.2d at 573. The proponent of the evidence has the burden of proving its reliability by clear and convincing evidence. *Id.*

In *Kelly*, the court of criminal appeals provided a non-exclusive list of factors to be considered in determining whether scientific evidence is reliable:

(1) the extent to which the underlying theory and technique are accepted as valid by the relevant scientific community;

(2) the qualifications of the expert testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error in the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person who applied the technique on the occasion in question.

*Id.*

■ Whether to admit scientific evidence is a decision within the discretion of the trial court, and absent an abuse of discretion, the reviewing court will not overturn that decision. *Mata v. State*, 46 S.W.3d 902, 908 (Tex.Crim.App.2001); *Griffith v. State*, 983 S.W.2d 282, 287 (Tex. Crim.App.1998). If the trial court's decision is within the "zone of reasonable disagreement," there is no abuse of discretion and the decision will be upheld. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex.Crim.App. 2002).

824 ■

## GPS Records

■ In his second issue, appellant asserts the trial court erred by admitting evidence of GPS records because the sponsoring witness was not a qualified expert and the records were not shown to be reliable.

The presentation of the GPS records took two forms. First, State's exhibit 63 is a spreadsheet showing the latitude and longitude coordinates, to the one-hundredth of a second, for appellant's truck at specific times, and the name, distance, and direction of the nearest city from that location. Second, State's exhibit 64 is a map of the United States with a line indicating appellant's route as shown by the coordinates in State's exhibit 63 with circles on the map indicating the locations of the coordinates on State's exhibit 63.

The State used two witnesses to gain admission of the GPS records: Bret Fenster, who testified how GPS worked and about its reliability, and Kori Easterwood, an employee of the trucking company in 1993 who testified that State's exhibit 63 was a business record. Easterwood also testified to ways in which the company verified the reliability of the GPS equipment.

Fenster testified outside the presence of the jury. He testified that he worked for Collin County in "GIS" and used GPS daily in his work, such as to prepare maps and to pinpoint the location of residences for purposes including the 911 system. He explained that GPS involves a series of orbiting satellites which transmit signals to Earth. The GPS receiver picks up the signals from several satellites, compares the different lengths of time it took the signal from each satellite to reach the receiver, and uses that information to triangulate the receiver's position on Earth and provide latitude and longitude coordinates. He testified that GPS is accepted as valid

in many civilian as well as military applications requiring positioning data, and that the acceptance of its reliability is analogous to that of an electronic calculator. Fenster stated that at the time he was testifying, March 2004, GPS was accurate to within a meter, and in 1993 it was accurate to within a kilometer.

Appellant argues Fenster was not qualified to testify about the reliability of GPS because his experience with GPS was in his job and because he lacked a "formal background" in GPS technology. Appellant cites no authority requiring a witness testifying about the reliability of GPS to have a "formal background" in GPS. Furthermore, the record does not show he lacked a "formal background" in GPS; Fenster testified he had a bachelor's degree in geography, and his testimony demonstrated a knowledge of how GPS worked and its reliability. Contrary to appellant's argument, we conclude the trial court could decide that a geographer who uses GPS daily in his job is qualified to testify about the reliability of GPS technology. Fenster's testimony demonstrated that GPS-figured coordinates are accepted as reliable in his field just as arithmetical sums on an electronic calculator are commonly accepted as reliable; and although GPS was not as accurate in 1993 as it was at the time of trial eleven years later, it was still accurate to within a kilometer. We conclude the trial court did not err in determining Fenster was qualified to testify about the reliability of GPS.

Easterwood testified she was the safety administrative coordinator for the trucking company and dealt with "[a]nything that would happen with our drivers or equipment anywhere within the country." Easterwood testified that each of the trucks had a Qualcomm computer with a GPS receiver that would transmit the truck's position to the company, usually

about once every hour. State's exhibit 63 was the company's record of that information for appellant's truck for the two weeks he worked for the company, October 29 to November 12, 1993. She testified that she was also able to verify the trucks' positions through fuel purchases, ATM card use, the drivers' check-in calls, and reports from the drivers and the customers about the arrival and departure times of the trucks. For example, the company's records about two of appellant's loads, State's exhibits 59 and 60, included the arrival and departure times at the shipping and receiving points and correspond to the GPS locations and times shown for appellant's truck in State's exhibit 63. In Easterwood's experience using the system at the trucking company, the computer system either worked and was accurate or it did not work and "doesn't pull any data."

Easterwood was not qualified as an expert on GPS. Her purpose was to explain how the GPS data, which Fenster's testimony showed was reliable, became a business record of the trucking company. Furthermore, her testimony established her understanding of the many systems the company used to track its drivers. Her testimony about State's exhibits 59 and 60 showing appellant's arrival and departure times at the shippers and receivers helped verify the accuracy of the GPS data in State's exhibit 63. Her testimony also showed that the system of transmitting and receiving the GPS data was automatic. She also testified that the drivers could prevent the transmission of the data by covering the transmitter, but she testified she has never known the information transmitted to be inaccurate.

We conclude Fenster's and Easterwood's testimony together was sufficient to establish by clear and convincing evidence the reliability of the GPS data. We hold the trial court did not err in admitting the evidence. We overrule appellant's second issue.

### DNA Statistics

In his third through fifth issues, appellant asserts the trial court erred in overruling his objections to the DNA experts' testimony regarding the statistical interpretation of the DNA tests.

#### Van Winkle

■ In his third issue, appellant complains of the statistical evidence of the likelihood that the DNA found under Franklin's fingernails came from appellant.[2] DNA analyst Carolyn Van Winkle stated in her report that appellant was a potential contributor of the DNA found in the right fingernail clippings taken from Franklin and that Franklin was excluded from being a contributor. Van Winkle also stated in her report that "[t]he probability of an unrelated individual selected at random having the [DNA markers] obtained from [Franklin's] right fingernail clippings is one in 150 thousand Caucasians, one in 400 Blacks and one in 78 thousand Hispanics." Because appellant is "Black[ ]," "one in 400 Blacks" is the relevant statistic.

Van Winkle testified she worked for the Southwestern Institute of Forensic Sciences, and she tested the fingernail clippings. Her report on the testing is dated June 1997. Van Winkle's DNA analysis tested for alleles at six different loci.

2. In phrasing his third, fourth, and fifth issues, appellant asserts the DNA experts testified the DNA found in the fingernail clippings and the cigarette butt was appellant's DNA. They testified that appellant's DNA was consistent with the DNA found in the fingernail clippings and cigarette butt, and they then stated the frequency with which the combination of the DNA markers they found occurred in the population among unrelated persons. They did not testify the DNA actually came from appellant.

Each of these alleles appears in the population in different proportions. Van Winkle used the population data from the National Research Council (NRC), which she testified used "conservative estimate[s]" of the frequency of each of the alleles in the population. During voir dire examination by defense counsel, Van Winkle testified as to how she calculated the "one in 400 Blacks" statistic:

Q. How is it done? How do you go from that data to one in 400?

A. It's done by calculating—using those allele frequencies in each of the databases, by calculating the genotype frequency. We use the NRC, the National Research Council, recommendations for conservativeness in that we use the beta factor. We incorporate that into any homozygous type that we have, and that just reflects that possible identical by descent issue on those particular items.

And it's a standard way of calculating genotype frequencies. Each one of those are—is multiplied together over the six alleles that we had typings on and ultimate number is detected, which is reflected in that one in 400 number.

Q. What's the formula?

A. I'm sorry. What formula?

Q. The formula for coming up with a number based on what you found here.

A. If you use the product rule, the product of each of the genotype frequencies at the six different loci.

Q. Did that formula come up with that number account for linkage between the different alleles?

A. These particular six alleles are not linked.

Q. How do you know that?

A. They are chosen—because their particular chromosome location is known, the studies have been shown that none of those six is linked to each other.

Q. Which—

A. They're on different chromosomes.

Appellant complains there was no testimony explaining whether multiplication was an accurate, accepted, or valid method of calculating the statistic; no testimony explaining what a "beta factor" is; and no testimony of the reliability or accuracy of the National Research Council's population database. Appellant did not point out these specific complaints about the predicate to the trial court; accordingly, he has not preserved error. *See* Tex.R.App. P. 33.1(a)(1); *Moore v. State,* 109 S.W.3d 537, 542 (Tex.App.-Tyler 2001, pet. ref'd).

■ Even if preserved, appellant's complaints lack merit. Van Winkle testified she is a registered medical technologist and has a master's degree with "major[s]" in biology and molecular biology and a "specialty" in blood bank technology. She has received training in forensic DNA analysis from the FBI academy, was a visiting scientist at the National Institute of Standards in Technology during the development of the first DNA technology, and has been an accredited DNA analyst since the inception of DNA testing in the late 1980s. She testified she has been trained in the statistical comparison and interpretation of DNA profiling results. She also testified she has performed "[m]aybe a million" DNA analyses. Van Winkle was, clearly, a highly qualified expert on all aspects of DNA analysis, including statistical interpretation of the DNA profile. Van Winkle testified that multiplication was the "standard way of calculating genotype frequencies." The trial court could accept her expert testimony on this issue. She explained that multi-

plication of the frequencies for each allele is a permitted method of determining the overall statistical likelihood of a person having all the alleles because they are unrelated. *See Watts v. State,* 733 So.2d 214, 225–26 (Miss.1999) (product rule approved by FBI in 1993 and by NRC in 1996 as method of calculating population frequency statistics; all state courts to have considered product rule since FBI and NRC approval have admitted evidence using it, citing cases from 11 other states). Likewise, in the absence of any challenge to the veracity of the NRC's population frequency database, the trial court could accept Van Winkle's reliance on its numbers. As for the unexplained "beta factor," nothing in the record explains the relevance of this factor; appellant did not question Van Winkle about it or object to the absence of any description of it.

We conclude appellant has failed to show the trial court abused its discretion in overruling his objection to Van Winkle's testimony and report on the population frequency statistic of the DNA she tested. We overrule appellant's third issue.

### Swienton

■ In his fourth issue, appellant complains of the trial court's overruling his objection to Anjali Swienton's testimony concerning the probability that the DNA found under Franklin's fingernail clippings belonged to appellant.

In her testimony and in her August 1997 report, Swienton stated she tested the scraping from the fingernail Van Winkle had previously tested at four loci different from the six loci at which Van Winkle had tested. In this testing, Franklin was again excluded as a donor of the DNA tested, and appellant was included in the class of potential donors of the DNA. Swienton calculated the statistical likelihood of unrelated persons having all ten of the DNA characteristics shown in Swienton's and Van Winkle's analysis at one in 5.9 million in the African–American population.

Swienton testified that she had degrees in molecular biology and forensic sciences and had performed about 500 DNA analyses in criminal cases while working at Cellmark Laboratories, now known as Orchid–Cellmark. She testified that the ten loci which she and Van Winkle tested were independent, and in support of this fact she "relied on validation from the FBI laboratory, as well as internal validation and published papers." She stated that her calculation of one in 5.9 million was a "statistical estimate." Swienton did not know on which chromosomes the ten loci were found. She then testified she did not know whether any of them were on the same chromosome, but she later testified she could say "with confidence" that the ten loci were each on a different chromosome. Defense counsel stated that if the loci were on the same chromosome, but close together, then that would affect the inheritability rate as the genes at those loci would be more likely to be passed on together instead of independently. Defense counsel also stated that if the loci were on the same chromosome but separated, they could still be more likely to be passed on together because of "crossing over" during the "meiotic process." Swienton testified that for the purpose of what she did, crossing over was "not relevant." She also testified that even if crossing over occurred, it would have only a slight affect on the inheritability rate: "it would not affect a statistic in the millions to make it, you know, in the thousands." Swienton also testified, "the FBI, Cellmark, other private laboratories and state laboratories, all do the—the same type of statistical frequency calculation, and I believe that it has—there's ample documentation that all ten of those loci are indepen-

dently inherited." Swienton did not have the documents with her to prove the independent inheritability, but she stated, "It's all been documented."

At trial, appellant objected to Swienton's population frequency calculation on the ground that her testimony failed to establish the reliability of her conclusions because of the possibility that two or more of the ten loci tested were on the same chromosome, affecting the independence of their inheritability and making the use of the product rule inappropriate. Appellant brings this same argument on appeal and argues Swienton's failure to bring forth the documentation proving the independent inheritability of each of the ten loci made her testimony unreliable. The State did not have to prove in court the independent inheritability of the ten loci; it had to prove that the scientific evidence was "reliable and therefore relevant." *Kelly*, 824 S.W.2d at 573. The State did so by Swienton's testimony that her frequency calculations were the same as used by the FBI, the laboratory for which she worked, and other private and public laboratories. She testified that the FBI sets the standards for the industry, that it "accepted this multiplication statistic for this particular set of DNA markers, and that that is predicated on them not being on the same chromosomes." This testimony shows the scientific theory and technique Swienton applied in making her population frequency calculation was accepted as valid in the scientific community. She also testified to the existence of documentation (i.e., literature) supporting the underlying scientific theory. Given this testimony, and the absence of any contrary expert testimony, we conclude the reliability of Swienton's population frequency calculation is shown by clear and convincing evidence.

▮▮▮▮ Appellant also argues Swienton did not identify which database she used to obtain her population frequency statistics and that the absence of this testimony rendered her conclusion unreliable. Appellant did not question Swienton on this subject, nor did he object at trial to the evidence on this ground, so this argument is not preserved for appellate review. Tex. R.App. P. 33.1(a)(1); *Moore*, 109 S.W.3d at 542.

Appellant has failed to show the trial court abused its discretion in overruling appellant's objections to Swienton's testimony. We overrule appellant's fourth issue.

### *Ratliff*

In his fifth issue, appellant asserts the trial court abused its discretion in admitting the testimony and report of Dawn Ratliff regarding the statistical frequency of the DNA of the objects found on or near Franklin's body. In 2003, Ratliff tested the sock found in Franklin's mouth, the shoelace and wire wrapped around Franklin's neck, and the cigarette butt found near Franklin's body. The DNA found on the items was consistent with appellant's DNA. Ratliff calculated that in the African–American population, the DNA recovered from the sock occurred with a frequency of one in 41.3 million unrelated individuals. The testing of the shoelace led to a result that the DNA occurred with a frequency in the African–American population of one in 85 unrelated individuals. The DNA recovered from the wire showed only that it was from a male. The cigarette butt contained a mixture of DNA consistent with appellant's DNA as the major donor and Franklin's DNA as the minor donor. When the mixture as a whole was considered, the statistical frequency in the African–American population was one in 787 unrelated individuals. When only the DNA from the major donor (i.e., the DNA consistent with appellant's)

was considered, the statistical frequency in the African–American population was one in 118 billion unrelated individuals.

Ratliff testified she had a masters of science degree. She had worked for Orchid–Cellmark for about three years where she did serology and DNA testing. Orchid–Cellmark's clients included many private and public entities around the country, and its work included the State of New York's rape kits, the Houston Police Department's cases, and the typing of the victims of the World Trade Center disaster. Orchid–Cellmark was accredited by four different entities, including the Texas Department of Public Safety. Ratliff is tested every six months on her proficiency in DNA analysis, and she has passed all those tests.

Ratliff testified that the DNA test she used tests thirteen loci. She stated this test is accepted in the scientific community and has been subjected to peer review around the world. It is "the most widely accepted used DNA identification method that we have in forensic testing today." In determining population frequency, Orchid–Cellmark used the FBI's population statistics, which Ratliff testified were widely accepted and approved by accredited laboratories besides the FBI.

Appellant asserts the trial court abused its discretion in admitting Ratliff's testimony of population frequency statistics because the State failed to demonstrate that the formula Ratliff used to calculate the statistics and the database on which Ratliff's calculations were based were reliable. At trial, appellant's rule 702 objection was, "I object under 702 as far as the statistical analysis of the data generated." This objection constituted a general objection and did not preserve error. TEX.R.APP. P. 33.1(a)(1); *Moore*, 109 S.W.3d at 542; *Scherl v. State*, 7 S.W.3d 650, 652 (Tex. App.-Texarkana 1999, pet. ref'd). Appel-

lant never questioned Ratliff concerning the independence of the loci tested. Furthermore, Ratliff's testimony about the wide acceptance of the FBI's population statistics that she used was sufficient to establish their reliability.

We conclude clear and convincing evidence supported the trial court's decision to admit Ratliff's population frequency statistics, and appellant has not shown the trial court abused its discretion in admitting that evidence. We overrule appellant's fifth issue.

### CUMULATIVE ERROR

In his sixth issue, appellant asserts that even if each individual error does not warrant a new trial, the cumulative effect of the errors warrants a new trial. As discussed above, appellant has failed to show the trial court erred. Accordingly, no cumulative error is shown. We overrule appellant's sixth issue.

We affirm the trial court's judgment.