**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 727

September Term, 2015

---

MARCUS ALLEN GROSS

v.

STATE OF MARYLAND

---

Woodward,
Friedman,
Sharer, J. Frederick
    (Retired, Specially Assigned),

JJ.

---

Opinion by Woodward, J.

---

Filed: July 27, 2016

A jury in the Circuit Court for Prince George's County convicted Marcus Allen Gross, appellant, of the commission of a theft scheme of property valued over $100,000, theft of property valued between $10,000 and $100,000, and conspiracy to commit theft of property valued over $100,000. Appellant noted this appeal and presents two questions for our review:

1. Did the trial court err in admitting GPS [global positioning system] records and testimony based upon those records?

2. Did the trial court commit plain error in instructing the jury on the elements of the crime of theft scheme?

For the reasons that follow, we answer both questions in the negative and affirm the judgments of the circuit court.

## BACKGROUND

Harry Eklof & Associates ("Eklof") distributes heating and plumbing supplies on the East Coast. The company is located at 3401 Pennsy Drive in Landover, Maryland, which is near 75th Avenue, East West Highway, and Route 50. At this location, the company has a warehouse that contains on any given day millions of dollars worth of inventory, including over $5 million in copper materials. Richard Jenkins, Eklof's operations manager, stated that the warehouse opens Monday through Friday at 6:00 a.m. for the company's drivers, and the warehouse employees arrive for work at 7:00 a.m. Although the warehouse remains open until 5:00 p.m., most warehouse employees leave by 3:45 p.m. In 2012, the company had approximately sixty employees, including two drivers. The company hired appellant as a warehouse employee in February 2012.

In July 2012, Eklof conducted its annual inventory. Jenkins testified that the company was "[a] little short, but nothing to raise a major concern." In early November 2012,

however, the company encountered a problem: employees reported shortages of copper fittings that the company's computer records indicated should have been in abundant supply. Jenkins conducted his own inventory and determined that 506 cartons of copper fittings, weighing a total of 19,065 pounds, were missing, meaning a loss to the company of $263,078.10.[1] Concerned, Jenkins had video surveillance installed in the warehouse to monitor the company's copper.

Shortly after installation of the surveillance, Jenkins reviewed the footage from November 19, 2012. The footage showed Terrence Mason, one of the company's drivers, take copper from the warehouse, place it in his personal vehicle, and drive away.[2] Jenkins decided to continue his observations to determine if Mason was acting alone.

The Monday after Thanksgiving, November 26, 2012, Jenkins arrived at the warehouse early, hid his vehicle, and concealed himself in a position from which he could observe the employee parking lot. From his hiding spot, Jenkins witnessed Mason arrive at the warehouse and place several cartons of copper fittings in his personal vehicle. Jenkins summoned police, and Mason was arrested at the warehouse. Shortly after 7:00 a.m. on the same day, appellant called Jenkins to say that he would be absent that day because he could not find a babysitter for his son. Appellant called with the same excuse the following day. On the next day, appellant gave the same excuse and told Jenkins he would re-apply for his

---

[1] The missing copper was unused and new; hence, it is sometimes referred to as "copper number 1." "Copper number 2" refers to used copper and may turn green due to exposure to the elements.

[2] We note that Jenkins testified that he "believed" he reviewed the footage from November 13th, but he was "reluctant to say the date without his notes." Mason testified that he took copper on November 19th, and this is the date used in charging appellant.

job "after he got everything taken care of," but he never contacted Jenkins again.

Detective Jeffrey Higgins of the Prince George's County Police Department was the lead investigator of the case. He ran the names of Eklof's employees through the Regional Automated Property Information Database ("RAPID"), which tracks pawn shop sales and scrap metal transactions. Appellant "stood out" to Detective Higgins because appellant scrapped a large amount of copper number 1. Between May 1, 2012, and November 26, 2012, appellant completed ten scrap transactions—five at Joseph Smith & Sons, Inc. ("Smith"), and five at Ultra Recycling, Inc. ("Ultra").[3] In total, appellant scrapped 408 pounds of copper number 1 for $1,118.80 at Smith and 3,980 pounds of copper number 1 for $11,433 at Ultra. Brian Benko, an information officer at Smith, testified that copper number 1 is rare in scrapping transactions because it is new and unused.

Benko also explained that, before a customer scraps metal, his company, as well as other scrap yards, document the scrapper's driver's license and license plate number. In examining the scrap records, Detective Higgins noticed that appellant usually drove his personal vehicle to the scrap yards, but, on two occasions, appellant drove a white box truck with Maryland tag number 71T531. Detective Higgins searched for this license plate in RAPID and discovered more scrap transactions completed by Jeff Ragland, appellant's cousin.

Ragland worked for the Schindler Elevator Company ("Schindler") as a driver. Ragland conducted eleven scrapping transactions with Ultra in which he sold a total of 6,846

---

[3] Smith is located at 2001 Kenilworth Avenue in Capitol Heights; Ultra is located at 8046 Fernham Lane in Forestville.

pounds of copper number 1 for $16,689.50, and three sales with East Coast Metals, LLC ("East Coast")[4] totaling 3,965 pounds of copper number 1 for $10,675.

Tom Tritle, the supervisor for repairs and truck teams at Schindler, testified that the company's drivers drove Ford F-550s or Isuzu box trucks. A driver's duties would be to make deliveries to work sites. Tritle stated that drivers would sometimes scrap metal taken from a site, but Schindler had a contract with PG Scrap for this business. Drivers are also required to keep a log of their work travels, indicating the time they were at particular locations.

Unbeknownst to the drivers, Schindler installed GPS units on its vehicles in July 2012. Tritle monitored the GPS information and occasionally compared the GPS data with the drivers' logs for accuracy. At trial, the State introduced through Tritle the records of GPS data for Ragland's truck, a white Isuzu box truck with Maryland tag number 71T531. The State asked Tritle to (1) read the date, time and address from the GPS records for certain dates, and then (2) highlight the entries that he read. The complete GPS records, with the highlighted entries, were introduced as an exhibit under the business records exception to the hearsay rule. *See* Md. Rule 5-803(b)(6). The GPS data indicated that on the days where the truck was used in scrap transactions, it would generally be at or near Eklof's warehouse at some point shortly before being at or near one of the scrap yards.[5] Indeed, Detective Higgins

---

[4] East Coast is located at 1015 Ritchie Road in Capitol Heights.

[5] The GPS records indicated the following data that is relevant to this case:

| Date | Time | Address |
|---|---|---|
| August 20, 2012 | 1:13 p.m. | 3395 Pennsy Drive and 75th Avenue |

(continued...)

4

testified that the GPS data revealed that "[t]here seems to be a pattern" of the truck going to Eklof and then to one of the scrap yards. Tritle testified that appellant was not an employee of Schindler and thus was not authorized to drive the box truck. Tritle also stated that Schindler had no business dealings with Eklof; Jenkins said the same.

Mason testified[5] as part of a plea deal. He stated that, sometime in September 2012, appellant approached Mason and said he had a way to make some extra money. Appellant offered Mason $200 if he would be a lookout while appellant took copper. Appellant identified Ragland and Ragland's truck as the vehicle that took the copper from Eklof's warehouse. As to the November 19th and 26th incidents, Mason testified that he worked alone and sold the copper to a friend for drug money.

The jury convicted appellant of a theft scheme of property valued over $100,000, theft

---

[5](...continued)

| | | |
|---|---|---|
| August 20, 2012 | 2:37 p.m. | 8036 Fernham Lane and Cryden Way |
| August 24, 2012 | 1:22 p.m. | 3395 Pennsy Drive and 75th Avenue |
| August 24, 2012 | 2:56 p.m. | 8038 Fernham Lane and Cryden Way |
| September 7, 2012 | 6:00 a.m. | Pennsy Drive and Corporate Drive |
| September 7, 2012 | 9:02 a.m. | 8036 Fernham Lane and Cryden Way |
| October 3, 2012 | 6:28 a.m. | 3574 Pennsy Drive and Veterans Parkway |
| October 3, 2012 | 2:11 p.m. | 8038 Fernham Lane and Cryden Way |
| October 4, 2012 | 6:21 a.m. | 3395 Pennsy Drive and 75th Avenue |
| October 4, 2012 | 9:47 a.m. | 8036 Fernham Lane and Cryden Way |
| October 5, 2012 | 6:31 a.m. | 3393 Pennsy Drive and 75th Avenue |
| October 5, 2012 | 10:16 a.m. | 8036 Fernham Lane and Cryden Way |
| October 19, 2012 | 2:12 p.m. | 3393 Pennsy Drive and 75th Avenue |
| October 19, 2012 | 3:24 p.m. | 8038 Fernham Lane and Cryden Way |
| October 20, 2012 | 12:06 p.m. | 1015 Ritchie Road and Ritchie Drive |
| October 22, 2012 | 1:00 p.m. | 995 Ritchie Road and Ritchie Drive |
| November 9, 2012 | 6:16 a.m. | 3377 75th Avenue and Pennsy Drive |
| November 9, 2012 | 1:48 p.m. | 995 Ritchie Road and Ritchie Drive |

of property valued between $10,000 and $100,000, and conspiracy to commit theft of property valued over $100,000, but acquitted him of theft of property valued over $100,000, theft of property valued between $1,000 and $10,000 as to the November 26, 2012 incident, and theft of property valued between $1,000 and $10,000 as to the November 19, 2012 incident. The circuit court merged appellant's conviction for theft into the conviction for theft scheme and sentenced appellant to a prison term of 25 years and a consecutive sentence of 25 years, suspending all but 20 years, for the conspiracy conviction, with five years of probation. Appellant was also ordered to pay $188,000 in restitution.

We will discuss more facts as necessary below.

## DISCUSSION

### I. The GPS Data

Appellant contends that the trial court erred in admitting the records of GPS data and testimony based on those records related to the box truck. The GPS records were admitted over objection during the direct examination of Tritle. Appellant argues that, in order for the circuit court to admit the GPS records, the State needed to offer expert testimony, because the GPS records are similar to cell phone geolocation data. According to appellant, although people are more familiar now with GPS technology because of smart phones and car navigation systems, the court still needed someone with specialized training and experience to testify as to the GPS data contained in the records. In particular, appellant argues that an expert was needed to testify as to, among other things, how GPS satellites work, how the system was installed in the truck, how frequently the system transmits data, and how often the GPS data is inaccurate.

6

The State counters that no expert testimony was necessary for the admission of the records of GPS data.[6] The State argues that the GPS data is different from cell phone geolocation data. According to the State, whereas the testifying witnesses in the cell phone cases use specialized training and experience to interpret the records, Tritle was not using any sort of expert knowledge to read the GPS records. Furthermore, the State asserts that jurors could readily understand the GPS data in this case, and no expert was, therefore, necessary.

The Court of Appeals has noted: "'It is frequently stated that the issue of whether a particular item of evidence should be admitted or excluded is committed to the considerable and sound discretion of the trial court . . . .'" *State v. Simms*, 420 Md. 705, 724 (2011)(quoting *Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594, 619 (2011)). Furthermore, "'[b]road discretion is vested in the trial court with regard to expert testimony, and that discretion will not be disturbed on appeal absent an error of law or fact, a serious mistake, or clear abuse of discretion.'" *Johnson & Higgins of Penn., Inc. v. Hale Shipping Corp.*, 121 Md. App. 426, 444 (quoting *Braxton v. Faber*, 91 Md. App. 391, 396 (1992)), *cert. denied*, 351 Md. 162 (1998). A court abuses its discretion where "'a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law.'" *Kelly v. State*, 392 Md. 511, 531 (2006) (quoting *Cooley v. State*, 385 Md. 165, 175 (2005)).

---

[6] The State also argues that this issue is not preserved, because appellant initially argued that the GPS data was inadmissible hearsay. Appellant , thereafter, raised a general objection when the State sought to admit the GPS records. Notwithstanding appellant's initial argument, a general objection preserves any argument as to the admissibility of evidence. *See Addison v. State*, 188 Md. App. 165, 176 (2009). Moreover, when the State sought to have Tritle read certain GPS entries from the records, appellant objected and raised the argument that he presents on appeal. Accordingly, this issue is preserved.

Expert testimony is governed by Maryland Rule 5-702, which permits a trial court to admit the testimony of an expert "if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is "'based upon specialized knowledge, skill, experience, training or education.'" *State v. Payne*, 440 Md. 680, 699 (2014) (quoting *Ragland v. State*, 385 Md. 706, 725 (2005)). Stated another way, "[t]estimony elicited from an expert provides useful, relevant information when the trier of fact would not otherwise be able to reach a rational conclusion; such information 'is not likely to be part of the background knowledge of the judge or jurors themselves.'" *Payne*, 440 Md. at 699 (quoting David H. Kaye, et al., The New Wigmore: a Treatise on Evidence: Expert Evidence § 1.1 (2d ed. 2010)).

Appellant contends that the GPS data in this case is similar to cell phone geolocation data. In *Wilder v. State*, 191 Md. App. 319, *cert. denied*, 415 Md. 43 (2010), *Coleman-Fuller v. State*, 192 Md. App. 577 (2010), and *Payne*, this Court and the Court of Appeals concluded that expert testimony was necessary for the admission of cell phone geolocation data. In *Payne*, for example, a police officer testified as a lay witness concerning the call detail records of Payne and Bond, who were suspects in a murder. 440 Md. at 685-86. The police officer stated that he had used the call detail records provided by Payne's and Bond's cell phone providers to create a chart listing certain information, including the cell towers through which calls were routed. *Id.* at 686. The officer explained that he would match certain data points about a call with a table on an "Excel spread sheet that c[a]me[] with the records" or a "secure Web site"—neither of which were offered into evidence—and he could then determine the latitude and longitude of the cell tower through which the call had been

8

routed. *Id.* at 686-87. The officer testified that both Payne and Bond made calls that had been routed through towers very near to the scene of the crime. *Id.* at 687-89.

The Court of Appeals determined that the State needed to qualify the police officer as an expert witness to testify about the cell phone geolocation data, because he "engaged in a process to derive his conclusion that Payne's and Bond's cell phones communicated through [specific] cell towers that was beyond the ken of an average person." *Id.* at 700. The officer applied specialized knowledge and experience to interpret the records and did more than simply read entries from the records. *Id.* at 700-01. Indeed, the officer's "testimony was that of an expert, because Call Detail Record entries are not entries typical of a cell phone bill where a juror could 'rely upon his or her personal experience' to understand their meaning." *Id.* at 701 (quoting *State v. Blackwell*, 408 Md. 677, 692 (2009)); *see also Coleman-Fuller*, 192 Md. App. at 614, 619 (holding that expert testimony was required for cell phone geolocation data, because the testifying officer stated that he had attended classes on the subject and had extensive experience); *Wilder*, 191 Md. App. at 368 ("[The testifying officer] elaborated on the information provided by the cell phone records—the bills and records of calls—by his use of a Microsoft software program to plot location data on a map and to convert information from the cellular phone records in order to plot the locations from which Wilder used his cell phone.").

We find appellant's comparison inapposite. Unlike the cell phone geolocation data cases, Tritle was not relying on special knowledge, skill, or training to interpret the GPS records for the box truck, nor did he "engage[] in a process to derive his conclusion . . . that was beyond the ken of an average person." *See Payne*, 440 Md. at 700. Rather, Tritle simply

9

read the GPS data as it appeared in the GPS records. Furthermore, we conclude that the average juror could understand the GPS records without expert help. The records indicate simply and clearly the date and time of the reading and the address at which the truck was then located. Furthermore, appellant was free to question Tritle on cross-examination about the company's GPS system, how it worked, and its reliability, but he failed to do so.

We note that neither appellant nor the State has cited to a case in Maryland addressing whether an expert is needed to admit GPS records into evidence, and our research has not revealed one. Some of our sister state courts and federal courts have, however, addressed this issue. For example, the United States Court of Appeals for the First Circuit concluded that no expert was needed to authenticate GPS records. *See United States v. Espinal-Almeida*, 699 F.3d 588, 612-13 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1837 (2013).

Although the crimes were different, *Brown v. State* presented a similar situation to the case *sub judice*. 163 S.W.3d 818 (Tex. Ct. App. 2005). Brown was a truck driver, and his company had GPS units installed on all of its vehicles. *Id.* at 820. Approximately a year after a body had been discovered in a park, Brown, then being held for other crimes, gave a statement to police that another truck driver had killed the victim in New Jersey, and Brown had agreed to drive the body to Texas and dispose of it. *Id.* at 821. In investigating further, police believed that Brown had acted alone. *Id.* 820-21. At Brown's trial, prosecutors introduced records of GPS data from his truck that showed that his truck had been near the park where the body had been discovered at approximately the time the body had been dumped there. *Id.* at 820. A witness from the trucking company testified as a lay witness as to the GPS data and its accuracy and reliability. *Id.* at 824-25. The Texas court concluded

10

that this witness did not need to be an expert. *Id.* at 825 ("Her purpose was to explain how the GPS data . . . became a business record of the trucking company.").[7]

Similarly, in the case *sub judice*, the State introduced the records of GPS data as a business record of Schindler. The witness in *Brown* was the trucking company's safety administrative coordinator; *id.* at 824; Tritle was the supervisor for the repair and truck teams. Both witnesses were testifying as to facts within their knowledge that did not require any specialized training, knowledge, or experience. Accordingly, we hold that expert testimony is not necessary for the admission of records of GPS data, where the witness merely reads the GPS data as it appears in the records. *See also Commonwealth v. Thissell*,928 N.E.2d 932, 934, 936-38 (Mass. 2010) (concluding that GPS records were business records and admissible in probation revocation hearing, despite testifying witness claiming that he was "not an expert"); *State v. Jackson*, 748 S.E.2d 50, 56-57 (N.C. Ct. App. 2013) (holding that lay witness testimony as to GPS data was admissible). *But see State v. Pirsig*, 670 N.W.2d 610, 616-17 (Minn. Ct. App. 2003) (concluding that expert testimony regarding GPS data was admissible).

## II. The Jury Instructions

Appellant contends that the circuit court committed plain error in its instruction to the jury as to the crime of theft scheme. Appellant concedes that the issue was not preserved, because there was no objection to the jury instructions at trial. Appellant argues, however,

---

[7] The State of Texas also had an expert witness testify as to how GPS worked. *Brown v. State*, 163 S.W.3d 818, 824 (Tex. Ct. App. 2005). This expert may have been necessary because the GPS data in *Brown* was recorded in 1993. *Id.* at 820. The expert testified about GPS technology in 1993 and informed the jury as to technological advances since that time. *Id.* at 824.

that the court failed to include a critical element of the charge in the instructions. Specifically, according to appellant, in order to find him guilty of a theft scheme, the court was required to instruct the jury that it must first find that appellant committed two or more thefts of property with an aggregate value of $100,000 or more as part of the scheme. Appellant also contends that the court failed to instruct the jury that theft is an element of a theft scheme.

The State responds that the circuit court did not commit plain error in instructing the jury. The State argues that a theft scheme implies the commission of more than one act of theft, and, in any event, the court's error was not plain or material.

Rule 4-325(e) states: "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." The Rule also provides that an appellate court may review any plain error in the giving of jury instructions, if that error is "material to the rights of the defendant." *Id.* This Court has noted: "The plain error hurdle, 'high in all events, nowhere looms larger than in the context of alleged instructional errors.'" *Peterson v. State*, 196 Md. App. 563, 589 (2010) (quoting *Martin v. State*, 165 Md. App. 189, 198 (2005)). The Court of Appeals has noted that appellate courts will generally "not invoke this discretion except in situations that are 'compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial.'" *Conyers v. State*, 354 Md. 132, 171 (quoting *State v. Hutchinson*, 287 Md. 198, 203 (1980)), *cert. denied*, 528 U.S. 910 (1999).

The evidence that appellant had committed multiple thefts—a scheme of thefts—with

12

other cohorts was substantial.  As Judge Moylan has explained, writing for this Court, plain error review is reserved for cases of "'truly outraged innocence [that] call for the act of grace of extending'" plain error review. *Jeffries v. State*, 113 Md. App. 322, 326, *cert. denied*, 345 Md. 457 (1997).  This is not one of those cases.  The State introduced documentary and photographic evidence that appellant and Ragland sold thousands of pounds of copper number 1 between May and November 2012, that the box truck's GPS data indicated that the truck was at Eklof and then later at a scrap yard on days that appellant or Ragland scrapped copper, and that Eklof was missing nearly 20,000 pounds of copper.  We, therefore, decline to exercise our discretion and engage in a plain error review of the jury instructions in this case.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**